Sixteen-year-old Nathan Dwayne Thomas, the appellant, was convicted for the murder of Robert "Chewman" Soles and was sentenced to life imprisonment. He raises four issues on this appeal from that conviction.
 I.
The appellant's first two issues involve his contention that his conviction should be reversed because of the allegedly improper admission of testimony concerning his "gang" affiliation.
The State's evidence tended to show that the victim was murdered in what is commonly referred to as a "drive-by shooting." Although the evidence indicated that the appellant did the actual shooting, present in the automobile with the appellant at the time of the shooting were Leon Carmichael, Deramus Dorsey, and Clarence Sweeney. Sweeney testified against the appellant at trial.
Sweeney was the first witness called to testify on the morning of the second day of the appellant's trial. Immediately before Sweeney took the witness stand, defense counsel requested that the trial court poll the jury because of the attention the news media had given this case during the overnight recess.
 "MR. HENDLEY [defense counsel]: WSFA [a Montgomery television station] last [night] on the six o'clock news, they featured District Attorney Charlie Graddick commenting about this case. He said *Page 1151 
that — The thrust of his statement was that this case — this drive-by was gang related. WHOA Newswatch 32 on the five o'clock news reported Nate [the appellant] was a self-proclaimed gang member. Montgomery Advertiser also this morning indicated that this was a gang-related activity.
 "Nothing in this trial has indicated that a gang or — gangs had anything to do with this, nothing showing it was gang related. In fact, all my conversations with Mr. Copeland and Mr. Hitson [deputy district attorneys] have been that there's no evidence that this was gang related.
 "My argument, Judge, is that this type of propaganda could be construed by some to be an attempt to poison the jury against my client. We would ask, Your Honor, to poll the jurors and see if any of them heard any accounts of this case either last night on the news or this morning in the newspapers." R. 190-91.
The trial judge questioned the jury and all jurors indicated that they had not seen any media coverage of this case during the overnight recess.
Sweeney began his testimony and almost immediately the following occurred:
 "Q. [by deputy district attorney Copeland] Clarence, are you a member of a gang?
"A. No, sir.
"Q. Is Nathan a member of a gang?
"A. Used to be.
 "MR. HENDLEY: Objection. That is irrelevant, Judge. No probative value.
"THE COURT: Overrule.
"Q. Answer the question.
"A. Used to be.
"Q. Used to be a member of which gang, please?
"A. Vice Lords." R. 195-96.
Later, on direct examination, Sweeney testified, without objection, that Dorsey was not in a gang (R. 202), that Carmichael was a member of the "Bloods" gang (R. 204), and that the appellant and Carmichael were "not even in the same gang." R. 204.
After Sweeney was excused from the witness stand, defense counsel requested a mistrial and the prosecutor replied, in the following exchange:
 "MR. HENDLEY: I want to renew my objection to the evidence that was admitted about Nathan Thomas being in a gang. We think that's highly prejudicial and inflammatory. Based on the admission of that evidence, we move for a mistrial, or in the alternative, for an instruction to the jury to disregard it, curative instruction.
 "MR. COPELAND: Judge, I would also like to put something on the record, because I feel certain that an issue of prosecutorial misconduct will be brought up on appeal of this trial, so I would like to address his motion, if you would like.
 "THE COURT: I would like for you to because I hope it is in some way related to the offense. That is the reason I let it in, because I thought it was relevant.
 "MR. COPELAND: When Mr. Hendley represented to you, it was correct, the State does not believe that this was a gang shooting. In the car, and I brought out from that witness, you had people from two different gangs. The relevance of it, Judge, has to do with the selected method of commission of the crime. It is a drive-by shooting. It is a well-known fact that drive-by shootings are a favored M.O. of gang activity. That is the purpose behind it. . . . I believe it [the motive] was robbery and that it was a personal retaliation. However, it was brought out that he was a member of a gang. It was a drive-by shooting. And that would be the purpose. If Your Honor agrees that the evidence — that that would not be sufficient for admitting the evidence, the State would join — would first volunteer not to mention anything about gang activity in closing statement or anything like that and would also join in Mr. Hendley's motion for a curative instruction and even a motion to strike that portion on the record about gangs. The purpose behind doing it is that this is a favored method of operation for gang people.
 "THE COURT: And that that's where he learned how to do it is from the standpoint of being associated with the gangs he *Page 1152 
learned about killing people by drive-by shootings?
 "MR. COPELAND: Yes, sir. By drive-by shootings, which the State believes is relevant.
 "MR. HENDLEY: To that, Judge, they are trying to show that because he's allegedly involved in an association of other people, that he has the motive or somehow formed the intent or is — has the propensity to commit a crime like this because he's in a gang. And that is just inadmissible, and I think it's prejudicial enough to warrant a mistrial.
". . . .
 "MR. COPELAND: . . . Nothing about gang activity has been introduced. The State hasn't argued it. The State hasn't elicited it from any witnesses. . . . The State introduced evidence through Clarence Sweeney that he was formerly, as a matter of fact, according to Mr. Sweeney, a gang member. And the purpose behind that, Judge, is this is a drive-by shooting which is a unique phenomenon in current American urban life. . . . And it is — does have a direct correlation to gangs. That's where drive-by shootings began. That's what the movies are showing. That is what television is showing. That is what is written about.
 "Now, with respect to why the State introduced the evidence, I would disagree on the record and would point to the record the State has maintained from the very beginning and prior to this trial in conversations with Mr. Hendley that it was the State's opinion that this was motivated by a robbery, that it was in retaliation for a robbery. I might assert, Your Honor, and I think reasonably so, that the retaliation for the robbery and the — the level of that retaliation, that being murder, and the style, that being a drive-by shooting, manifests membership in a gang.
". . . .
 "THE COURT: What you are saying is I ought to grant your mistrial because the witness responded, the defendant used to be in a [sic] member of a gang? That's basically what it is?
 "MR. HENDLEY: That in addition to inserting the whole issue of gang membership into the trial. It's not fair.
". . . .
 "THE COURT: I'm going to order the prosecutors not to talk about gangs anymore if this is not any type of, quote, gang-related hit of some kind. . . . [I]f . . . [the rest of the witnesses] are going to say that this was simply in retaliation for murder — or robbery, rather, then y'all don't be talking about gangs anymore.
 "So I'm going to deny your motion for a mistrial. If you want me to give some kind of limiting instruction, I will entertain doing that. You prepare an instruction for me during the lunch recess and let me look at it. However, I'm concerned that any instruction you may bring may be more detrimental than it will be helpful to you." R. 249-56
During the presentation of the defense's case, the trial judge admonished defense counsel for injecting evidence of the "Tabatha Ross — Skatehaven murder"[1] into the trial: "[Y]ou have been talking about them [the prosecution] injecting gangs into this whole thing, and Tabatha Ross is as much a gang murder as any other one, and you're injecting it just as much as they are." R. 378.
The attorney general argues that this issue was not properly preserved for review. "Objection to a question must be made as soon as the question is stated." Embrey v. State,283 Ala. 110, 116, 214 So.2d 567, 573 (1968). "When a question is asked of a witness calling for inadmissible matter, it is mandatory upon the party against whom it is offered to object after the question but before the answer." C. Gamble, McElroy's *Page 1153 Alabama Evidence § 426.01(3) (4th ed. 1991).[2]
However, in this case, the subsequent comments of the trial judge make it clear that he ruled on the substantive merits of the objection. Apparently, his initial ruling was not based on any procedural matter; the trial judge "thought" that the evidence was relevant and that this killing was gang-related. Consequently, the attorney general's argument must be rejected. An appellate court cannot use "aprocedural basis that was not asserted until appeal to justify an alleged substantive error." Ex parte Williams,571 So.2d 987, 989 (Ala. 1990).
"[I]n its modern usage, without qualification, [the word "gang"] denotes — in common intent and understanding — criminal action." Lanzetta v. New Jersey, 306 U.S. 451, 456,59 S.Ct. 618, 620, 83 L.Ed. 888 (1939). We equate the association of a defendant with a "gang" as evidence of a collateral criminal act that is presumptively prejudicial and that is admissible only when probative and under certain limited exceptions. See Bolden v. State, 595 So.2d 911
(Ala.Cr.App. 1991), cert. denied, 595 So.2d 914 (Ala. 1992). SeeEx parte Dill, 600 So.2d 372, 373 (Ala. 1992) ("gratuitous references, even indirect ones, to past criminal activity have required the reversal of criminal convictions"). See also H. Schwab, "Of Gangs and Guilt," 3 Los Angeles Lawyer 13 (1990) (evidence of organizational membership as proof of crime). "[E]ven if the proffered evidence [of prior bad acts] fits within an exception to the general exclusionary rule, its probative value must outweigh its prejudicial effect for the evidence to be admissible." Ex parte Smith, 581 So.2d 531,535 (Ala. 1991).
The appellant's initial objection to the prosecutor's question eliciting the status of his gang membership should have been sustained. Although the trial judge's assumption was not without some basis outside the courtroom[3], a judge should determine relevancy based on the evidence already presented or on the expressed expectations and assurances of the attorneys.
We vigorously reject the prosecutor's contention that the appellant's gang membership was admissible to show where and how he learned to commit murder. That had absolutely nothing to do with any issue in this case. See State v. Stone, 104 Or. App. 534,539-40, 802 P.2d 668, 671 (1990) (gang activity irrelevant to prove that defendant knew the car was stolen). Compare People v. Mendez, 221 Ill. App.3d 868, 164 Ill.Dec. 321, 326-27, 582 N.E.2d 1265, 1270-71 (1991), appeal denied,143 Ill.2d 644, 167 Ill.Dec. 406, 587 N.E.2d 1021 (1992) (gang affiliation may be relevant to show intent or motive). We staunchly condemn the injection of this irrelevant matter into this case.
However, we find that this error does not warrant a reversal of the appellant's conviction because defense counsel failed to take advantage of the judge's offer of curative action. Although each case of improper comment must be judged on its own particular merits, the mere reference to a collateral *Page 1154 
offense does not constitute a ground for an automatic mistrial. The appellate courts of this State have held that such improper evidence is capable of being "cured" and 'eradicated" by proper instructions from the trial judge. For example, see Ex parte Jefferson, 473 So.2d 1110, 1114-15
(Ala. 1985), cert. denied, 479 U.S. 922, 107 S.Ct. 328,93 L.Ed.2d 300 (1986); Cole v. State, 548 So.2d 1093, 1095
(Ala.Cr.App. 1989).
"A mistrial is an extreme measure which should be granted only when the prejudicial qualities of the comment cannot be eradicated by instructions or other actions by the trial court." Colvette v. State, 568 So.2d 319, 325
(Ala.Cr.App. 1990). The appellant has not preserved any argument that the prosecutor's reference to the appellant's gang membership was so prejudicial as to be ineradicable. "Under circumstances where curative instructions would have been proper to cure the error and appellant declines the instructions, then the appellant is not entitled to relief on appeal." Campbell v. State, 570 So.2d 1276, 1282
(Ala.Cr.App. 1990).
 II.
The appellant contends that he was not properly advised of his constitutional rights under Miranda v. Arizona,384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
The appellant was arrested on March 26, 1991, pursuant to a petition issued by the juvenile court. After his arrest, the appellant waived his rights on three separate occasions. After his arrest, the appellant was first interviewed in the conference room at police headquarters. Both of the appellant's parents were present. R. 342. At 7:27 that morning, before his parents arrived, the appellant had signed a written waiver of his constitutional rights. After that interview, the interrogation moved to the "video room" where the appellant signed another written waiver of rights at 9:01 that same morning. When this second waiver was signed, the appellant's father was present. R. 343. Immediately before that second written waiver was signed by the appellant, at almost the very beginning of the videotaped statement, the following occurred:
 "Q. [Detective J.R. Ward] I'm going to read your rights to you again. I read them to you earlier at 0727 and you understood your rights at that time, that's correct[?]
"A. [The appellant] Yes sir.
 "Q. Ok, I'm going to read them to you again. Before asking any questions I must explain to you that you can remain silent but anything you say can be used against you in court, that you can talk to a lawyer first and that you have the right to the advice or present [sic] of a lawyer even though you cannot afford to hire one. If you cannot afford to hire a lawyer and want one present at the interrogation the Court will appoint one before questioning. If you want to ask a question now you can do so but you can stop answering anytime. You have the right to communicate with your parents or guardian before any question[ing] if necessary. Reasonable means will be provided for you to do so. You understand your rights[?]
"A. Yes sir.
"The time will be 0901.
". . . .
 "Q. Ok, if you can read I want you to read this paragraph out loud to me.
 "A. I fully understand the foregoing statement and do willingly agree to answer questions. I understand and know what I am doing. No promise or threat have been made to me by anyone and no pressure of any kind has been made against me by anyone.
"Q. You understand that?
"A. Yes sir.
"Q. You understand your rights also?
"A. Yes sir.
 "Q. You sign right here saying you understand you[r] rights." State's Exhibit 4, pp. 1-2.
The appellant contends that he was not accurately informed of his constitutional rights and that the underlined portion of the warnings Detective Ward gave the appellant were confusing and rendered the appellant's waiver involuntary. The emphasized portion of the warning, as contained in the "juvenile rights form," read: *Page 1155 
 "If you want to answer questions now, you can do so, but you can stop answering at any time. You have the right to communicate with your parent or guardian before questioning and if necessary, reasonable means will be provided for you to do so." State's Exhibits 2 and 3 (emphasis added).
We find that the appellant intelligently, knowingly, and voluntarily waived his constitutional rights. The two written waivers signed by the appellant contained an accurate statement of the appellant's "juvenile-Miranda" rights. See Rule 11, A.R.Juv.P. Although the detective "misspoke" in describing the constitutional rights available to the appellant, it is clear to this Court that he fully conveyed to the appellant his rights as required by Miranda. The warnings Detective Ward gave the appellant were taken from the "juvenile rights form."
"Reviewing courts . . . need not examine Miranda warnings as if construing a will or defining the terms of an easement. The inquiry is simply whether the warnings reasonably 'conve[y] to [a suspect] his rights as required by Miranda.' [California v.Prysock, 453 U.S. 355, 361, 101 S.Ct. 2806, 2810,69 L.Ed.2d 696 (1981)]." Duckworth v. Eagan, 492 U.S. 195, 203,109 S.Ct. 2875, 2880, 106 L.Ed.2d 166 (1989) (additional "warning" that the police could not provide the defendant with a lawyer, but that one would be appointed "if and when you go to court" did not render warnings constitutionally defective). Here, as inDuckworth, "the initial warnings given to [the appellant] touched all of the bases required by Miranda." 492 U.S. at 203,109 S.Ct. at 2880.
 "Th[e Supreme] Court has never indicated that the 'rigidity' of Miranda extends to the precise formulation of the warnings given a criminal defendant. . . . Nothing in [the court's] observations [in cases decided after Miranda] suggests any desirable rigidity in the form of the required warnings.
 "Quite the contrary, Miranda itself indicated that no talismanic incantation was required to satisfy its strictures. The Court in that case stated that '[t]he warnings required and the waiver necessary in accordance with our opinion today are, in the absence of a fully effective equivalent, prerequisites to the admissibility of any statement made by a defendant.' 384 U.S., at 476, 86 S.Ct., at 1629 (emphasis supplied)."
California v. Prysock, 453 U.S. at 360-361, 101 S.Ct. at 2809.
 III.
The appellant contends that the prosecutor attempted to bolster the credibility of the State's own witness.
On direct examination of Clarence Sweeney, the prosecutor elicited the witness's testimony that he was testifying because his attorney had told him that the charges against him would be dismissed. The prosecutor elicited Sweeney's further testimony that Sweeney had discussed this murder with the prosecutor, that he had told the prosecutor the truth, that he intended to tell the truth on the witness stand, and that the prosecutor had only told him to tell the truth. Then, while still on direct examination, the following occurred:
 "Q. [prosecutor] Did I tell you any particular way to say anything? Did I say, oh, don't bring out this fact or do bring out that fact?
"A. No.
 "MR. HENDLEY: I'm going to have to object to this. The prosecution is attempting to bolster the credibility of the witness. That's improper.
"THE COURT: Overruled." R. 200.
This issue has not been preserved for review because the objection was untimely. McElroy's § 426.01(3).
The appellant had a fair trial. The judgment of the circuit court is affirmed.
AFFIRMED.
All Judges concur.
[1] See Rudolph v. State, CR-91-618, presently pending on appeal before this Court. See also N.D.T. v. State, 592 So.2d 647, 649
(Ala.Cr.App. 1991), involving this appellant's appeal from the order of the juvenile court transferring the appellant to circuit court for criminal prosecution as an adult on the charge of murder.
[2] To his reply brief the appellant has attached the affidavit of the trial court reporter that the answer and the objection "were spoken simultaneously." This is not a part of the record and cannot be considered on appeal. Tyus v. State,347 So.2d 1377, 1380 (Ala.Cr.App.), cert. denied, 347 So.2d 1384
(Ala. 1977).
The attorney general has not argued the untimeliness of the appellant's request for a mistrial, as separate from the untimeliness of the objection. See Robinson v. State,584 So.2d 533, 538-39 (Ala.Cr.App.), cert. quashed, 584 So.2d 542
(Ala. 1991).
[3] There appears to be a close relation between gang affiliation and drive-by shootings. See United States v. Sweeting,933 F.2d 962 (11th Cir. 1991); N.D.T. v. State, 592 So.2d 647
(Ala.Cr.App. 1991); Matter of Jose T., 282 Cal.Rptr. 75,230 Cal.App.3d 1455 (1991); In re Sergio R., 279 Cal.Rptr. 149,228 Cal.App.3d 588 (1991); Thai v. Stang, 263 Cal.Rptr. 202,214 Cal.App.3d 1264 (1989); People v. Rosales,237 Cal.Rptr. 558, 192 Cal.App.3d 759 (1987); People v. SuperiorCourt of Los Angeles County, 186 Cal.Rptr. 734, 137 Cal.App.3d 90
(1982); Haynes v. State, 199 Ga. App. 288,404 S.E.2d 585 (1991); People v. Mendez, 221 Ill. App.3d 868, 164 Ill.Dec. 321, 582 N.E.2d 1265 (1991), appeal denied, 143 Ill.2d 644, 167 Ill.Dec. 406, 587 N.E.2d 1021 (1992); State v. Stone, 104 Or. App. 534, 802 P.2d 668 (1990); State v. Sims, 105 Or. App. 318, 804 P.2d 1205, review denied, 311 Or. 433, 812 P.2d 828
(1991); State ex rel. Juvenile Department of Multnomah Countyv. Holloway, 102 Or. App. 553, 795 P.2d 589 (1990); State v.Thierry, 60 Wn. App. 445, 803 P.2d 844 (1991). *Page 1156