[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1168 
Jimmy Davis, Jr., was indicted for the capital offense of murder committed during a robbery in the first degree, or during an attempt thereof. Ala. Code 1975, § 13A-5-40 (a)(2). The jury found him guilty and recommended, by a vote of 11-1, that the trial court sentence him to death. The trial court accepted this recommendation. The Alabama Court of Criminal Appeals remanded the case twice, once, on October 20, 1995, for the trial court to enter a formal sentencing order, Davis v. State,718 So.2d 1148 (Ala.Cr.App. 1995), and again on July 3, 1996, for the trial court to make additional findings of fact *Page 1169 
relating to the prosecution's reasons for peremptorily striking black persons from the jury venire. Upon the trial court's return to the second remand, the Court of Criminal Appeals unanimously affirmed Davis's conviction and sentence, by an opinion issued March 21, 1997.
In his petition for certiorari review, Davis again raises the issues that were addressed by the Court of Criminal Appeals, as well as a number of issues that were not presented to, or that were not addressed by, that court. We have thoroughly reviewed his arguments, as presented both in his brief and in oral argument, and, pursuant to Rule 39(k), Ala. R. App. P., we have also searched the record of the guilt and sentencing phases of his trial for any plain error or defect that might have adversely affected his substantive rights. Although we have found no reversible error, we will discuss four of the issues presented.
We begin by noting these facts, as set out by the Court of Criminal Appeals in its opinion of March 21, 1997:
 "The state's evidence showed that on March 17, 1993, the appellant, Alphonso Phillips, and Terrance Phillips made plans to rob the Direct Oil Station, a gasoline service station in Anniston. According to the plan, the appellant, who possessed a .25 caliber semiautomatic pistol, would point the pistol at the station operator, Alphonso would grab the money, and Terrance would act as a lookout. The state's evidence supports the conclusion that the appellant was the principal actor in the conspiracy. He conceived the idea to rob the station and he recruited the others to help him. As the trio approached the station, Terrance changed his mind, abandoned the conspiracy, and walked away. Alphonso and the appellant approached the station; the appellant confronted the operator, Johnny Hazle, in the doorway of the station, pointed the pistol at him, and said, `Give it up, fuck-nigger.' The appellant almost immediately fired two shots from the pistol, which struck Hazle in the chest and abdomen. Terrance testified that he was about a block from the station, walking toward his home, when he heard two or three shots fired. After the shooting, the appellant and Alphonso ran from the scene. Hazle died from these wounds shortly thereafter. Three empty .25 caliber shell casings were recovered at the scene, and two bullets of he same caliber were recovered from Hazle's body. The pistol was subsequently recovered. The ballistics evidence showed that the two bullets recovered from Hazle's body and the three empty shell casings found at the scene had been fired from the appellant's pistol. Alphonso and Terrance entered into agreements with the state pursuant to which in return for their testimony against the appellant they would be permitted to plead guilty to conspiracy to commit robbery in the first degree.
 "Alphonso, testifying for the state, stated that as he and the appellant reached the door of the station, the appellant pointed the pistol at Hazle and said, `Give it up, fuck-nigger'; that Hazle looked inside the store and smiled; and that the appellant shot Hazle when he smiled. Several witnesses for the state testified that the appellant told them shortly after the shooting that he had shot the Direct Oil Station operator. In his testimony, Terrance described his conversation with the appellant as follows:
 "`He [the appellant] said he had told him [the operator], "Give it up, fuck-nigger." And then he said the man had smiled or something at him, laughed or something. And then he said he had shot and the man kicked the door. And then he shot again. I don't know — I can't remember how many times he said he shot. And then he said they ran.'
 Alphonso testified as follows: `[The appellant] said, "Man, I shot that fuck-nigger, I shot him." And then he said, "The second time felt even better than the first time."' Willie James Smith, an acquaintance of the appellant, testified, `[The appellant] . . . told me he had shot someone . . . [a]nd told me he had robbed Direct and shot someone.' Smith also testified that the appellant told him that Alphonso and Terrance were with him and that the appellant `said that the man wouldn't give up the *Page 1170 
money, so he shot him three times.' Shannon Hardy Wilson, another acquaintance of the appellant, testified as follows about his conversation with the appellant:
 "`Before they got in there, he said they pulled up their bandannas and they went in there. And when he got to the door [the appellant] said, "Give it up. And that Mr. Hazle laughed at him and that Alphonso ran. And then he said he told him to give it up again. And he said Mr. Hazle laughed at him and then he shot him.'
 Wilson further testified that the appellant said he `wasn't going to let no cracker laugh at him.'"
718 So.2d at 1155.
Davis did not give a confession to the police and, as the foregoing statement of facts indicates, much of the evidence against him consisted of testimony from Terrance Phillips, Alphonso Phillips, Willie James Smith, and other acquaintances. Davis did not testify at trial, and his primary trial strategy was to attempt to discredit the testimony of the state's witnesses through cross-examination and arguments to the jury and the trial court.
 I.
Davis argues that the only evidence directly linking him with the robbery and murder of Hazle was the testimony of Alphonso Phillips, Terrance Phillips, and Willie Smith. Based upon the evidence of Alphonso Phillips's participation in the robbery that ended in the murder of Jimmy Hazle, the trial court held that, as a matter of law, Alphonso Phillips was an accomplice to the crimes that Davis was charged with. Davis relies on §12-21-222, Ala. Code 1975:
 "A conviction of felony cannot be had on the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the commission of the offense, and such corroborative evidence, if it merely shows the commission of the offense or the circumstances thereof, is not sufficient."
Davis argues that Terrance Phillips and Willie Smith were accomplices to the crimes he was charged with, just as Alphonso Phillips was, and that their testimony, therefore, could not properly be used to corroborate Alphonso Phillips's testimony.Knowles v. State, 44 Ala. App. 163, 204 So.2d 506 (1967). He contends that, beyond the "accomplice" testimony of Terrance Phillips and Willie Smith, there was no evidence to link him with the robbery and murder of Johnny Hazle; thus, he concludes, his sentence and conviction should be overturned.
Before § 12-21-222 is invoked, it must clearly appear that the witness is an accomplice, and it is the defendant's burden to prove that a witness is an accomplice, unless the evidence shows without dispute that the witness is an accomplice. Steele v.State, 512 So.2d 142 (Ala.Cr.App. 1987). The evidence clearly established that Alphonso Phillips acted as Davis's accomplice in the robbery that ended in the murder of Johnny Hazle, and the trial court thus properly held that, as a matter of law, Alphonso Phillips was Davis's accomplice. Davis contends that the trial court should likewise have held that, as a matter of law, Terrance Phillips and Willie Smith were also Davis's accomplices, so that their testimony against him would have to be corroborated.
Davis emphasizes that Terrance Phillips was indicted for the same offense as Davis was; however, the mere fact that a witness is indicted for the same crime as the defendant does not alone mark the witness as an accomplice with the defendant in the commission of the crime. Steele v. State, supra. The evidence shows that, on the day of the crime, Terrance Phillips went to a nearby community center after school, that Davis and Alphonso Phillips were already there, and that they already had a plan to rob Direct Oil. The evidence shows that the two informed Terrance Phillips of the plan, and that he walked with them in the direction of Direct Oil. There is no evidence that Terrance Phillips participated in the formulation of the plan, or that he helped execute it; rather, it is clear that Terrance Phillips separated himself from Davis and Alphonso Phillips before the commission of the crime. These facts are sufficient to present a jury question as to whether Terrance Phillips was *Page 1171 
an accomplice in Davis's crime, and to support a finding by the jury that Terrance Phillips was not an accomplice.
As to Willie Smith, the evidence merely shows that on the morning of March 17, 1993, Davis came to the motel room where Smith and a friend were lodging and that Smith "handled" the gun that Davis used later that day in the murder of Johnny Hazle. No evidence indicates that Smith had any prior knowledge that Davis planned to used the gun in the commission of a crime, or that Smith otherwise participated in the robbery-murder. The only evidence of any complicity on Smith's part was that, after Davis had robbed Direct Oil and murdered Johnny Hazle, Davis discussed this crime with Smith. We agree that this was not a sufficient basis upon which the trial court could have determined, as a matter of law, that Smith was Davis's accomplice in the crime; on the contrary, the evidence would support a jury's finding of fact that Smith was not Davis's accomplice.
"`The test for determining whether there is sufficient corroboration of the testimony of an accomplice consists of eliminating the testimony given by the accomplice and examining the remaining evidence to determine if there is sufficient incriminating evidence tending to connect the defendant with the commission of the offense.'" Ex parte Scott, 460 So.2d 1371
(Ala. 1984) (quoting Ware v. State, 409 So.2d 886, 891
(Ala.Cr.App. 1981)). "Such corroborative evidence does not have to be very strong, or even sufficient to support a conviction, but merely must logically tend to link the accused with the offense."Scott, at 1373. There was abundant evidence, through the testimony of Terrance Phillips and Willie Smith, to connect Davis with the robbery of Direct Oil and the murder of Johnny Hazle. Moreover, even if the jury considered Terrance Phillips and Willie Smith to be Davis's accomplices, and thus followed the trial court's instructions that their testimony would likewise require corroboration, the record provides such corroboration. We therefore find no merit in Davis's argument as to this issue.
 II.
Davis next argues that, during voir dire examination of the venire, the trial court erred to reversal in failing to strike for cause certain members of the venire who, according to Davis, gave responses indicating a bias against him. As Davis points out, it is fundamental that jurors who display prejudice or bias against a defendant should be removed for cause from the petit jury panel. Ross v. Oklahoma, 487 U.S. 81, 108 S.Ct. 2273,101 L.Ed.2d 80 (1988); State v. Freeman, 605 So.2d 1258
(Ala.Cr.App. 1992). He argues that the trial court should have struck these jurors for cause from the venire, and that its failure to do so forced his defense counsel to use valuable peremptory strikes to remove them from the venire. Davis concludes that this amounts to a denial of his right to a fair and impartial jury and that he is therefore entitled to a new trial.
To justify a challenge for cause, there must be a proper statutory ground or "`some matter which imports absolute bias or favor, and leaves nothing to the discretion of the trial court.'"Clark v. State, 621 So.2d 309, 321 (Ala.Cr.App. 1992) (quotingNettles v. State, 435 So.2d 146, 149 (Ala.Cr.App. 1983)). This Court has held that "once a juror indicates initially that he or she is biased or prejudiced or has deep-seated impressions" about a case, the juror should be removed for cause. Knop v. McCain,561 So.2d 229, 234 (Ala. 1989). The test to be applied in determining whether a juror should be removed for cause is whether the juror can eliminate the influence of his previous feelings and render a verdict according to the evidence and the law. Ex parte Taylor, 666 So.2d 73, 82 (Ala. 1995). A juror "need not be excused merely because [the juror] knows something of the case to be tried or because [the juror] has formed some opinions regarding it." Kinder v. State, 515 So.2d 55, 61
(Ala.Cr.App. 1986). Even in cases where a potential juror has expressed some preconceived opinion as to the guilt of the accused, the juror is sufficiently impartial if he or she can set aside that opinion and render a verdict based upon the evidence in the case.Kinder, at 60-61. In order to justify disqualification, a juror "`must have more than a bias, or fixed *Page 1172 
opinion, as to the guilt or innocence of the accused'"; "`[s]uch opinion must be so fixed . . . that it would bias the verdict a juror would be required to render.'" Oryang v. State,642 So.2d 979, 987 (Ala.Cr.App. 1993) (quoting Siebert v. State,562 So.2d 586, 595 (Ala.Cr.App. 1989)).
Davis first argues that juror no. 96 should have been struck for cause because, he claims, the juror demonstrated an inability to apply the presumption of innocence or to require the state to carry its burden of proof. The following occurred during voir dire:
 "[Defense counsel]: Is there anybody on the panel that thinks that if the state presents their case and they say they're finished that Jimmy Davis ought to show you anything at all? That means he ought to offer a case himself.
"[Juror 96]: Yes. I want both sides of the story.
". . . .
 "[Defense counsel]: If the judge tells you that Jimmy Davis doesn't have to prove anything, do you still have an opinion that Jimmy Davis must prove something to you?
"[Juror 96]: Yes."
Davis argues that this exchange conclusively proves that juror no. 96 exhibited a clear inability to apply the presumption of innocence that he was entitled to at trial. However, juror no. 96 later clarified her statements in the following exchange during voir dire:
"[The Court]: Further questions by the state?
 "[The State]: Yes sir, Judge. I have just a couple of follow-up questions.
 "[Addressing juror no. 96], I want to make sure that I understand what you have said a minute ago. . . . Under the law as the Judge — we expect him to instruct it to you, the burden is on the State of Alabama. Because he's presumed innocent, we have to prove our case. Under the law he has to do nothing. Okay. He can or can not [testify], depending on whatever he decides. Do you understand that?
"[Juror 96]: Uh huh [affirmative].
 "[The State]: So that unlike in your situation at home and my situation at home, the whole burden is on one party and that party is the party that I represent. Now, based on what I told you and what we expect the Judge to tell you, in this situation could you follow the Judge's instructions and if he says that the burden is on the State of Alabama and the defense has no burden, could you follow that instruction?
"[Juror 96]: Sure.
 "[The State]: Okay. I think that's what we were trying to get at.
"[Juror 96]: Okay. I'm sorry if I misunderstood."
(Emphasis added.)
Davis's counsel moved to strike juror no. 96, and the trial court denied his motion. After reviewing the voir dire examination of juror no. 96 in its entirety, we cannot conclude that the trial court abused its discretion in denying the challenge for cause. The record shows that, although the juror initially expressed a desire to "hear both sides of the story," she also expressed a willingness and ability to put this desire aside in order to follow the trial court's instructions as to the State's burden of proof. In view of this, and in deference to the fact that the trial court had the opportunity to observe the juror's manner of speech, demeanor, body language, and tone and appearance during these responses, we cannot hold that the trial court's ruling in regard to this juror was an abuse of discretion.
Davis next argues that, during voir dire, juror no. 24 indicated a strong affiliation with the victim's family and that she therefore should have been struck for cause. Davis did not challenge this juror for cause; thus, we need only determine whether the trial court committed plain error in failing to strike juror no. 24 sua sponte. "`Plain error' arises only if the error is so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings." Exparte Bankhead, 585 So.2d 112, 117 (Ala. 1991). *Page 1173 
During voir dire, juror no. 24 told the trial court that she knew the victim's family from church and that she did not want to sit on the jury because she knew too many of the victim's family members. Juror no. 24 stated, in pertinent part:
"[Defense counsel]: Yes ma'am, you knew Mr. Hazle?
 "[Juror 24]: Yes, I knew his family. They're members of the church where I attend.
". . . .
 "[Defense counsel]: All right, . . . would the fact that you knew all these people, would that cause you any problems if you were selected on this jury?
"[Juror 24]: I'm afraid it would.
 "[Defense counsel]: All right. Let me put it to you another way then. If you were selected on this jury, would you be able to set aside the fact that you knew Johnny Hazle or his family and reach a decision based solely on the evidence in the case?
"[Juror 24]: I would try.
 "[Defense counsel]: Okay. That's a pretty good answer, but are you saying you're not sure?
"[Juror 24]: Yes, sir.
 "[Defense counsel]: Do you think it might influence you in some way?
"[Juror 24]: I'm afraid so."
However, the trial court questioned juror no. 24 further, as follows:
 "[The Court]: . . . [L]et me ask you a question. Is your answer one really that you would be uncomfortable in sitting as a member of the jury and would rather not?
"[Juror 24]: Yes, sir.
 "[The Court]: I understand that. The legal question, however, is if in fact you were selected could you sit as a fair and impartial juror, put out of your mind whatever you have heard from any family members of the Hazle family, or anything you've heard on any news reports of any kind, listen just to the evidence in this case, and if you had to from that evidence strictly determine what the facts are and apply the law?
"[Juror 24]: Yes, I think I could, yes.
 "[The Court]: But your answer is you had rather not; is that it?
 "[Juror 24]: I have never been in court. I don't know anything about it.
"[The Court]: I understand.
"[Juror 24]: But I could."
(Emphasis added.)
We agree with the State that the voir dire of juror no. 24 does not reveal an absolute bias or favor on her part; on the contrary, she was forthright in expressing both her reservations about serving on the jury and her belief that she could overcome those reservations and properly render a decision in the case, based upon the evidence and the law. In view of this, we find no plain error in the trial court's failure to strike this juror sua sponte.
 III.
Davis next argues that during closing arguments the prosecution made improper remarks that violated his rights to a fair trial, due process, and a reliable verdict. Davis first contends that the prosecution improperly commented upon his decision not to testify at trial and that, under Alabama law, this error, taken alone, mandates a reversal of his conviction. Davis points out that "[i]t is a basic principle of law that once a defendant chooses not to testify at his trial the exercise of that choice is not subject to comment by the prosecution." Wherry v. State,402 So.2d 1130, 1133 (Ala.Cr.App. 1981). "In determining if a prosecutorial remark impairs the integrity of the defendant's right not to testify the test is whether the defense can show that the remark[, given the context in which it was made,] was intended to comment on the defendant's silence or was of such character that a jury would naturally and necessarily construe it as a comment on the defendant's silence." United States v.LeQuire, 943 F.2d 1554, 1565 (11th Cir. 1991), cert. denied,505 U.S. 1223, 112 S.Ct. 3037 120 L.Ed.2d 906 (1992). Additionally, we note that at trial Davis did not object to the comments he complains of here, and, therefore, that his argument must be reviewed for plain error; that is, for "those errors that *Page 1174 
`seriously affect the fairness, integrity or public reputation of judicial proceedings.'" Kuenzel v. State, 577 So.2d 474
(Ala.Cr.App. 1990), affirmed, Ex parte Kuenzel, 577 So.2d 531, cert. denied, Kuenzel v. Alabama, 502 U.S. 886, 112 S.Ct. 242,116 L.Ed.2d 197 (1991) (quoting United States v. Young,470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985)).
Davis argues that during closing argument the prosecutor repeatedly drew the jury's attention to the fact that Davis did not testify. According to Davis, the prosecutor reminded the jury that each of the other persons who participated in the crime had testified and that only Davis could "tell a different story." To support this argument, Davis points to the following excerpt from the prosecutor's argument:
 "What do we have to show that Alphonso and Terrance are telling the truth? I submit to you, ladies and gentlemen, if you're going to get together and concoct a story about somebody else doing a crime, first thing you're going to do is exonerate yourself. You're going to get yourself out of it.
 "Now, what would keep Shannon, Alphonso and Terrance from getting together and putting Alphonso as a lookout that just walked off, didn't do anything? Why did Alphonso change his story now? . . . Who was going to say different? . . .
". . . .
 "Why didn't they say Jimmy hid the gun in the back yard? Who was going to say different than that?
". . . .
 "Why did Alphonso — why didn't he just say Jimmy had the gun all day? Why didn't he say that? Who was going to dispute that? . . . Why didn't he just say Jimmy had it? Who was there to dispute it? Why didn't he? Because it wasn't the truth.
". . . .
 "It's rare, ladies and gentlemen, to see people cooperate against their friends in situations like this. And that's the reason you can't just discount what they've done here today, yesterday. It takes some guts, particularly when you're as young as though [sic] fellows were.
". . . .
 "Because, ladies and gentlemen, I wanted them to testify. And they did testify. . . . And I submit to you, ladies and gentlemen, you know who it was that did this killing. It's Jimmy Davis. The man's been sitting over there with his attorneys."
(Emphasis added.) Davis argues that these comments served only to focus the jury's attention on the fact that he did not personally refute the testimony of the other witnesses, and that they implied to the jury that he would have done so if he was innocent.
In closing argument, Davis's counsel attacked the credibility and character of the witnesses who knew Davis, suggesting that Alphonso Phillips and the other witnesses against Davis could gain from lying on the stand, and thus conspired against Davis by testifying against him. The State points out that, in its rebuttal argument, it repeatedly offered examples of how, if the witnesses were indeed conspiring to falsely testify against Davis, they could have done so to their own greater benefit by telling a different story. After reviewing the State's comments in their full context, we cannot hold that they would naturally and necessarily be construed as an attack on Davis's decision not to testify on his own behalf; rather, they could well be construed as a form of cohesive rebuttal to defense counsel's theory that the witnesses against Davis were lying in order to rid themselves of involvement in the crime.
Davis next argues that in his closing argument the prosecutor made comments insinuating that Davis had been involved in a gang before he was arrested for this crime. Davis points out that the evidence in this case did not suggest that Hazle's murder was connected to gang activity, and he argues that the prosecutor nevertheless used his closing argument to inject irrelevant implications of gang activity into the trial, in violation of the trial court's ruling on a motion in limine to exclude any evidence of alleged gang activity on Davis's part. *Page 1175 
Before trial, counsel for Davis made a motion in limine to exclude any evidence of gang activity on Davis's part. The following colloquy occurred:
 "[Defense counsel]: Judge, one other thing that's not really entailed in the motion in limine, but I would like to make it orally at this time, that the state be instructed not to allow any of their witnesses to testify to the word `gang' or gang-related activities.
 "[The State]: Judge, certainly the state does not intend at this point to bring out any possible testimony that could be brought out that his crime was in any way related to gang activity.
 "We would reserve the right, again, if we felt like that was, in fact, admissible at some point during the course of the trial we would certainly approach the Court and ask the Court to allow us to admit testimony of that prior to us doing so.
 "[The Court]: All right. That motion in limine is granted. At least to the extent that there will be no mention of such conduct or activity without prior notice to the trial judge and to defense counsel."
No evidence at trial established, or even implied, that Davis had any involvement in gangs. However, Davis argues that the prosecutor circumvented the motion in limine by making remarks during closing argument that, he says, were tantamount to accusations that Davis was a gang member and that were so highly prejudicial as to mandate the reversal of his conviction.
During closing arguments, defense counsel argued primarily that the testimony of Willie Smith, Alphonso Phillips, Terrance Phillips, and others was not reliable. In response to these arguments, the prosecutor stated, in pertinent part:
 "[The State]: Ladies and gentlemen, if I brought — if I could — if I could bring somebody that was the pillar of the community down here to say, `Yes, I saw Jimmy Davis kill Johnny Hazle at Direct Oil,' then don't you think I'd do it?
 "But that's not what you get. You get the people that were there. The people that are involved in the crime. . . . I don't have anybody from Parker Memorial or from St. Michael's [apparent references to Baptist and Episcopal churches in Anniston]. And you have to understand that.
 "We've got people that this is the streets [sic]. This is the streets where young men these days make their bones and they carry the badge of honor with bandannas —
 "[Defense counsel]: Judge, I object to that line of argument.
 "[The State]: Judge, I can appeal for law enforcement all day long. And we would ask the court to allow me to do so.
"The Court: Overrule the objection.
 "[The State]: They have guns, just like this gun that was acquired. And in this situation, the guns and the bandannas led to a man's death. These were teenagers from good homes. I think you could see that."
Davis concedes that in its closing argument the State did not explicitly accuse him of being a gang member; however, he argues that it is "common knowledge" that bandannas may be used as gang paraphernalia and that the prosecution's reference to a bandanna as a "badge of honor" so strongly invoked the imagery of gang membership as to amount to an outright accusation that the defendant was a gang member.
Davis relies upon Haralson v. State, 227 Ga. App. 118,488 S.E.2d 497 (1997), wherein the Georgia Court of Appeals affirmed the granting of a mistrial on the ground that the prosecutor had impermissibly placed the defendant's character into issue by eliciting testimony that the defendant was a gang member. Defense counsel challenged the testimony of a codefendant who had not immediately testified against the defendant; the prosecution then elicited testimony to show that the delay was due to the codefendant's fear of retribution from the defendant's fellow gang members. The defense objected to this testimony, arguing that it put the defendant's character into issue; the court instructed the State not to "go into anything about gangs."227 Ga. App. at 119, 488 S.E.2d at 498. The prosecutor then pointed out to the court that the defendants were alleged to have been wearing bandannas on the night of the murder, and asked the *Page 1176 
Court's permission to examine the witness concerning the significance of colors of bandannas and as to whether the defendant had worn a certain bandanna on the night of the murder. The trial court ruled that the State could ask whether the defendant had worn a bandanna, for the purpose of establishing identification, but could not ask the witness why the defendant might have been wearing the bandanna. 227 Ga. App. at 118,488 S.E.2d at 498.
The prosecution in Haralson subsequently asked the witness a series of questions relating to the defendant's wearing a bandanna, including questions as to whether that witness and other witnesses were members of a gang; whether they had bandannas; what colors the bandannas were; and what color bandanna the defendant wore on the night of the murder. After the witness stated that all of the codefendants were gang members, that they wore blue or black bandannas, and that the defendant also wore a blue bandanna, the defendant moved for a mistrial.Id. In granting the mistrial, the trial court held that the prosecutor's questions had gone beyond the scope allowed by its earlier ruling because, it ruled, the order in which the questions were posed caused them to call for character evidence. The trial court denied the defendant's subsequent motion to bar a retrial, holding that there was no indication that the prosecutor had intended to cause a mistrial by her line of questioning. The Georgia Court of Appeals held that the trial court had properly declared the mistrial, but that the evidence supported the trial court's denial of the motion to bar retrial. 227 Ga. App. at 120,488 S.E.2d at 499.
Davis argues that here, as in Haralson, the prosecutor's mention of "bandannas" during his closing remarks was synonymous with reference to gang involvement. Davis points out that Alabama courts have considered evidence of a defendant's association with a "gang" as functionally equivalent to evidence of a "collateral criminal act," so that such evidence "is presumptively prejudicial and . . . is admissible only when [it is] probative and [only] under certain limited exceptions." Thomas v. State,625 So.2d 1149, 1153 (Ala.Cr.App. 1992), reversed on othergrounds, Ex parte Thomas, 625 So.2d 1156 (Ala. 1993). In Thomas, the defendant was convicted of murder, based upon his alleged participation in a "drive-by shooting." Although drive-by shootings are often associated with gang activity,[1] there was no evidence that the shooting at issue in Thomas was gang-related. However, the prosecution intentionally elicited testimony from a state's witness indicating that the defendant was a member of a certain gang and that he was in the company of other gang members when the shooting took place. The defendant objected, arguing that the testimony was irrelevant and highly prejudicial, particularly in view of the common association of "drive-by shootings" with gang activity. The trial court overruled the defendant's objection to this testimony; however, the trial court later gave the jury a curative instruction, even after the defendant had refused the instruction.
The Court of Criminal Appeals agreed that evidence of gang involvement may be considered evidence of a collateral crime and that evidence of the defendant's alleged gang involvement was irrelevant. Thomas, 625 So.2d at 1150. However, because the defendant refused the trial court's offer of a curative instruction, the Court of Criminal Appeals held that the error did not warrant reversal. 625 So.2d at 1154.
This Court reversed the judgment of the Court of Criminal Appeals in Thomas, holding that, under the particular circumstances of the case, the trial court's giving of a curative instruction would not necessarily have been adequate to counteract the prejudice caused by the testimony concerning the defendant's alleged gang involvement. This Court stated, "In light of the massive media coverage of gang violence in contemporary society, the assertion that a defendant's membership in a gang . . . will not prejudice him in the eyes of a jury is simply untenable." Ex parte Thomas, 625 So.2d at 1157. This Court also pointed out that "the jury had already heard references to gangs at least four times before it retired for deliberations," 625 So.2d at 1158, and that the trial court's curative instructions, coming after it *Page 1177 
had overruled the defendant's objection to the admission of the testimony, could have confused the jurors or reinforced in their minds the inadmissible evidence. 625 So.2d at 1158.
We recognize that admitting evidence of a defendant's association with an ill-received organization or group may constitute reversible error, Dawson v. Delaware, 503 U.S. 159,112 S.Ct. 1093, 117 L.Ed.2d 309 (1992), and that mentioning gang activity — in particular the prosecutor's mentioning it in the trial of a case that is itself not gang-related, and to which gang-related activity has no connection — may invite a reversal.Walker v. State, 631 So.2d 294 (Ala.Cr.App. 1993). However, we do not agree with Davis that the prosecutor's mention of "bandannas" as a "badge of honor" was equivalent to an improper reference to gang activity, such as was present in both Haralson and Thomas. In Haralson, the detailed evidence as to the defendant's wearing a bandanna and the significance of its color unequivocally linked the defendant with gang involvement. Likewise, in Thomas, the evidence directly established that the defendant was associated with a gang and it was particularly prejudicial because the crime in question was of a type commonly associated with gang activity.
In contrast, in this present case, the prosecutor's reference to "bandannas" was not even made in regard to Davis; it certainly did not directly link him to gang involvement. The prosecutor made this reference in the context of responding to defense counsel's argument that the State's witnesses were "liars"; the prosecutor admitted that the State's witnesses were not "pillar[s] of the community" but were instead from "the streets where young men . . . carry the badge of honor with bandannas." Even in view of "the massive media coverage of gang violence in contemporary society," Ex parte Thomas, 625 So.2d at 1157, we find no basis for holding that the prosecutor's reference to bandannas was an overt, or even a veiled, reference to a gang affiliation. Moreover, if the reference to bandannas carries any generally negative connotation, it necessarily reflects upon the State's own witnesses, not upon the defendant. We therefore hold that the prosecutor's remarks do not warrant a reversal of Davis's conviction.
 IV.
Davis next argues that during the sentencing phase of the trial the court improperly considered evidence of his prior juvenile offenses in determining whether he should receive the death penalty. Davis also argues that a separate reference to gang affiliation, made in the presentencing report rather than in the prosecutor's closing arguments, was highly prejudicial and was improperly considered by the trial court in its sentencing order.
Before the sentencing hearing, defense counsel objected to a portion of the presentencing report that refers to allegations that Davis was a member of a gang. That objection was as follows:
 "[Defense counsel]: And then, Judge . . . it is stated that it's not only reported by a codefendant and other witnesses, but also other witnesses in prior cases, that Mr. Davis was a ringleader of the `Folks' gang and then it's got a branch of `Disciples' in West Anniston. And the defendant disputes that."
Davis argues that this portion of the presentencing report was irrelevant on the question of the existence of the aggravating circumstances allowed into evidence under Ala. Code 1975, §13A-5-49, and that it did not serve to rebut any evidence offered in mitigation. He also argues that the trial court's considering his juvenile adjudications was, in itself, reversible error, even if the court did not consider the allegations of Davis's gang involvement to be part of his history of juvenile delinquency.
Davis points out that "juvenile adjudications are not convictions and are not criminal in nature" and thus cannot be considered as prior criminal activity under the Alabama capital sentencing scheme. Freeman v. State, 555 So.2d 196, 212
(Ala.Cr.App. 1988), affirmed, Ex parte Freeman, 555 So.2d 215
(Ala. 1989), cert. denied, Freeman v. Alabama, 496 U.S. 912,110 S.Ct. 2604, 110 L.Ed.2d 284 (1990). He theorizes that is it "highly likely" that the trial court considered his prior juvenile adjudications as proof of *Page 1178 
gang involvement, thereby exacerbating the error, and concludes that the trial court's sentencing order was thus based upon inadmissible and highly prejudicial evidence, which mandates that we reverse his sentence and order a new sentencing hearing.
We find nothing in the record to support Davis's contention that the trial court considered the allegations of his gang involvement when it determined his sentence and drafted its sentencing order. The presentencing report contained evidence of Davis's prior adjudications of delinquency based on theft, receiving stolen property, and trespass. However, the report also showed that, since 1987, when he became an adult, Davis had been convicted on misdemeanor counts alleging assault, trespass, theft, and resisting arrest and also on one felony count alleging robbery in the third degree.
In its order sentencing Davis to death, the trial court cited only two aggravating circumstances: (1) that Davis murdered Johnny Hazle during a robbery attempt and (2) that Davis had a prior felony conviction for third-degree robbery. In considering the "mitigating circumstance" set out in § 13A-5-51 (1) — that "[t]he defendant has no significant history of prior criminal activity" — the trial court specifically cited Davis's prior juvenile adjudications in negation of that factor.
While we find no merit in Davis's argument that in determining his sentence the trial court considered the suggestion that he had been involved in gang activity, we agree that the trial court erred in considering Davis's juvenile adjudications. The juvenile adjudications could not properly be used to negate the mitigating circumstance of "no significant history of prior criminal activity." However, it is clear that, without regard to
Davis's juvenile adjudications, the evidence of Davis's convictions of various misdemeanors and, most important, his conviction of robbery, would preclude the trial court from finding that he had "no significant [criminal] history." Because the properly considered evidence of Davis's criminal convictions would negate this mitigating factor, we conclude that the trial court's error in considering Davis's juvenile adjudications was harmless.
 Conclusion
This Court has reviewed the record and the briefs filed in this Court; it has considered the arguments made before this Court on oral argument; and it has examined the determinations of the Court of Criminal Appeals in regard to all the issues raised by Davis. Moreover, in compliance with Rule 39(k), Ala. R. App. P., we have searched the record of Davis's trial, both the guilt phase and the sentencing phase, for any plain error or defect that may have "adversely affected his substantial rights." We find no error, plain or otherwise, that requires us to reverse the Court of Criminal Appeals' affirmance of Davis's conviction and sentence. The judgment of the Court of Criminal Appeals is therefore affirmed.
AFFIRMED.
HOOPER, C.J., and MADDOX, SHORES, HOUSTON, COOK, and SEE, JJ., concur.
[1] See Thomas v. State, 625 So.2d 1149 n. 3 (Ala.Cr.App. 1992).
 *Page 1