After Remand from the Alabama Supreme Count

WELCH, Judge.
The appellant, Jimmy Davis, Jr., appeals the denial of his petition for postconviction relief filed pursuant to Rule 32, Ala. R.Crim.P., in which Davis attacked his 1993 capital-murder conviction and sentence of death. We affirmed the circuit court’s denial of Davis’s Rule 32 petition. See Davis v. State, 9 So.3d 514 (Ala.Crim.App.2006). On certiorari review the Alabama Supreme Court reversed in part this Court’s decision after finding that we had erroneously applied the procedural default grounds in Rule 32(a)(3) and (5), sua sponte, to bar Davis’s claims that his trial counsel’s performance was ineffective. See Ex paRe Davis, 9 So.3d 537 (Ala. 2007). The Supreme Court remanded the case for this Court to consider the merits of Davis’s ineffective-assistance-of-counsel claims that were raised in Davis’s brief.
The facts surrounding the robbery/murder are relevant in addressing the issues raised in Davis’s brief to this Court. This Court set out the following facts in our opinion on Davis’s direct appeal:
“The state’s evidence showed that on March 17, 1993, the appellant, Alphonso Phillips, and Terrance Phillips made plans to rob the Direct Oil Station, a gasoline service station in Anniston. According to the plan, the appellant, who possessed a .25 caliber semiautomatic pistol, would point the pistol at the station operator, Alphonso would grab the money, and Terrance would act as a lookout. The state’s evidence supports *543 the conclusion that the appellant was the principal actor in the conspiracy. He conceived the idea to rob the station and he recruited the others to help him. As the trio approached the station, Terrance changed his mind, abandoned the conspiracy, and walked away. Alphonso and the appellant approached the station; the appellant confronted the operator, Johnny Hazle, in the doorway of the station, pointed the pistol at him, and said, ‘Give it up, fuck-nigger.’ The appellant almost immediately fired two shots from the pistol, which struck Ha-zle in the chest and abdomen. Terrance testified that he was about a block from the station, walking toward his home, when he heard two or three shots fired. After the shooting, the appellant and Alphonso ran from the scene. Hazle died from these wounds shortly thereafter. Three empty .25 caliber shell casings were recovered at the scene, and two bullets of the same caliber were recovered from Hazle’s body. The pistol was subsequently recovered. The ballistics evidence showed that the two bullets recovered from Hazle’s body and the three empty shell casings found at the scene had been fired from the appellant’s pistol. Alphonso and Terrance entered into agreements with the state pursuant to which in return for their testimony against the appellant they would be permitted to plead guilty to conspii’acy to commit robbery in the first degree.
“Alphonso, testifying for the state, stated that as he and the appellant reached the door of the station, the appellant pointed the pistol at Hazle and said, ‘Give it up, fuck-nigger’; that Ha-zle looked inside the store and smiled; and that the appellant shot Hazle when he smiled. Several witnesses for the state testified that the appellant told them shortly after the shooting that he had shot the Direct Oil Station operator. In his testimony, Terrance described his conversation with the appellant as follows:
“ ‘He [the appellant] said he had told him [the operator], “Give it up, fuck-nigger.” And then he said the man had smiled or something at him, laughed or something. And then he said he had shot and the man had kicked the door. And then he shot again. I don’t know — I can’t remember how many times he said he shot. And then he said they ran.’
“Alphonso testified as follows: ‘[The appellant] said, “Man, I shot that fuck-nigger, I shot him.” And then he said, ,“The second time felt even better than the first time.” ’ Willie James Smith, an acquaintance of the appellant, testified, ‘[The appellant] ... told me he had shot someone ... [a]nd told me he had robbed Direct and shot someone.’ Smith also testified that the appellant told him that Alphonso and Terrance were with him and that the appellant ‘said that the man wouldn’t give up the money, so he shot him three times.’ Shannon Hardy Wilson, another acquaintance of the appellant, testified as follows about his conversation with the appellant:
“ ‘Before they got in there, he said they pulled up their bandannas and they went in there. And when he got to the door [the appellant] said, “Give it up.” And that Mr. Hazle laughed at him and that Alphonso ran. And then he said he told him to give it up again. And he said Mr. Hazle laughed at him and then he shot him.’
“Wilson further testified that the appellant said he ‘wasn’t going to let no cracker laugh at him.’
“The appellant did not testify and called only one witness in the guilty *544 phase, Tim Whatley, an investigator with the Anniston police department, who testified as to his observations at the scene of the crime shortly after the shooting and the description of the fleeing suspects he obtained from witnesses at or near the scene. The appellant’s defense strategy consisted mainly of trying to discredit or to cast doubt upon the testimony of the state’s witnesses through cross-examination and arguments to the jury and to the trial court. By these means, he attempted to exploit differences as to some details in their testimony, attempted to persuade the jury that under the facts it was more likely that Alphonso did the shooting, argued to the jury and to the trial court that the facts surrounding the commission of the crime better fit the elements of the lesser included offense of felony-murder rather than with the offense of capital murder, and attempted to cast doubt upon the veracity of Alphonso, Terrance, and Smith (who was involved with the authorities in an unrelated case) by emphasizing the deals they had made with the state for lenient treatment in return for their testimony.”
Davis v. State, 718 So.2d 1148, 1155 (Ala.Crim.App.1995) (footnote omitted).

Standard of Review

When reviewing a circuit court’s denial of a Rule 32 petition we apply an abuse-of-discretion standard. Elliott v. State, 601 So.2d 1118, 1119 (Ala.Crim.App. 1992). On direct appeal we reviewed Davis’s trial proceedings for plain error. See Rule 45A, Ala.R.App.P. However, the plain-error standard of review does not apply in Rule 32 petitions. Hill v. State, 695 So.2d 1223 (Ala.Crim.App.1997); Neelley v. State, 642 So.2d 494 (Ala.Crim.App.1993).
This postconviction proceeding was initiated by Davis. According to Rule 32.3, Ala.R.Crim.P., Davis has the “burden of pleading and proving by a preponderance of the evidence the facts necessary to entitle the petitioner to relief.”
Moreover, when reviewing claims of ineffective assistance of counsel, we apply the standard announced by the United States Supreme Court in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The petitioner must show: (1) that counsel’s performance was deficient; and (2) that the petitioner was prejudiced by the deficient performance.
“Judicial scrutiny of counsel’s performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel’s assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel’s defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. Cf. Engle v. Isaac, 456 U.S. 107, 133-34 (1982). A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel’s challenged conduct, and to evaluate the conduct from counsel’s perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel’s conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action ‘might be considered sound trial strategy.’ See Michel v. Louisiana, [350 U.S. 91], at 101 [ (1955) ]. There are countless ways to provide effective assistance in any given case. Even the best criminal defense *545 attorneys would not defend a particular client in the same way.”
466 U.S. at 689, 104 S.Ct. 2052. As the United States Supreme Court further stated:
“[Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel’s judgments.”
466 U.S. at 690-91, 104 S.Ct. 2052. This Court has noted that
“ ‘[t]he purpose of ineffectiveness review is not to grade counsel’s performance. See Strickland [v. Washington], [466 U.S. 668,] 104 S.Ct. [2052] at 2065 [(1984)]; see also White v. Singletary, 972 F.2d 1218, 1221 (11th Cir.l992)(“We are not interested in grading lawyers’ performances; we are interested in whether the adversarial process at trial, in fact, worked adequately.”). We recognize that “[Representation is an art, and an act or omission that is unprofessional in one case may be sound or even brilliant in another.” Strickland, 104 S.Ct. at 2067. Different lawyers have different gifts; this fact, as well as differing circumstances from case to case, means the range of what might be a reasonable approach at trial must be broad. To state the obvious: the trial lawyers, in every case, could have done something more or something different. So, omissions are inevitable. But, the issue is not what is possible or “what is prudent or appropriate, but only what is constitutionally compelled.” Burger v. Kemp, 483 U.S. 776, 107 S.Ct. 3114, 3126, 97 L.Ed.2d 638 (1987).
[[Image here]]
“ ‘Because the reasonableness of counsel’s acts (including what investigations are reasonable) depends “critically” upon “information supplied by the [petitioner]” or “the [petitioner]^ own statements or actions,” evidence of a petitioner’s statements and acts in dealing with counsel is highly relevant to ineffective assistance claims. Strickland, 104 S.Ct. at 2066. “[An] inquiry into counsel’s conversations with the [petitioner] may be critical to a proper assessment of counsel’s investigation decisions, just as it may be critical to a proper assessment of counsel’s other litigation decisions.” Id. (“[W]hen a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel’s failure to pursue those investigations may not later be challenged as unreasonable.”).’
“Chandler v. United States, 218 F.3d 1305, 1313-19 (11th Cir.2000) (footnotes omitted).”
Gaddy v. State, 952 So.2d 1149, 1157 (Ala.Crim.App.2006).
“The reasonableness of counsel’s investigation and preparation depends critically on the information supplied by the defendant. Commonwealth v. Peterkin, 511 Pa. 299, 513 A.2d 373 (1986), cert. denied, 479 U.S. 1070, 107 S.Ct. 962, 93 L.Ed.2d 1010 (1987); Strickland v. Washington, 466 U.S. 668, 104 S.Ct. *546 2052, 80 L.Ed.2d 674, reh’g denied, 467 U.S. 1267, 104 S.Ct. 3562, 82 L.Ed.2d 864 (1984). Appellant’s own failure to cooperate with counsel in order to apprise him of allegedly relevant information cannot now provide a basis for ineffectiveness claims.”
Commonwealth v. Uderra, 550 Pa. 389, 401, 706 A.2d 334, 340 (1998). “If the record is silent as to the reasoning behind counsel’s actions, the presumption of effectiveness is sufficient to deny relief on ineffective assistance of counsel claim.” Howard v. State, 239 S.W.3d 359, 367 (Tex.Crim.App.2007).
“ ‘An ambiguous or silent record is not sufficient to disprove the strong and continuing presumption [of effective representation]. Therefore “where the record is incomplete or unclear about [counsel]’s actions, we will presume that he did what he should have done, and that he exercised reasonable professional judgment.” ’ Chandler v. United States, 218 F.3d 1305, 1314 n. 15 (11th Cir.2000) (en banc) (quoting Williams v. Head, 185 F.3d 1223, 1228 (11th Cir.1999)).”
Grayson v. Thompson, 257 F.3d 1194, 1218 (11th Cir.2001).
Initially, the State argues that Davis has waived his arguments concerning ineffective assistance of counsel because the section of Davis’s brief in which those arguments are made does not comply with Rule 28(a)(10), Ala.R.App.P. Rule 28, Ala.R.App.P., governs the contents of an appellate brief and states that the brief shall contain “an argument containing the contentions of the appellant/petitioner with respect to the issues presented, and the reasons therefor, with citations to the cases, statutes, other authorities, and parts of the record relied on.” Rule 28(a)(10), Ala.R.App.P.
Specifically, the State argues:
“Davis failed to argue any of his 34 individual claims of ineffective assistance ... [Ijnstead, he relied on one general claim that ‘the evidence is simply overwhelming that defense counsel failed under any technical standard of measurement’ and that ‘[n]o excuses advanced by the State and adopted by the Court hold up.’ This general attack on Davis’s trial attorneys, the State and Judge Street is not sufficient to be considered an argument under Rule 28(a)(10) because Davis failed to pick any of the 34 claims raised in his petition as the one (or ones) upon which Judge Street incorrectly denied post-conviction relief.”
(State’s brief at pages 20-21.) We believe that, “[although another attorney may have treated the ineffective-assistance of counsel argument differently,” Davis’s brief is marginally sufficient to fulfill the requirements of Rule 28(a)(10), Ala. R.App.P. See Ex parte Borden, [Ms. 1050042, August 17, 2007]-So.3d-, -(Ala.2007).
During trial, Davis was represented by attorneys Steven D. Giddens and Jonathan L. Adams. Giddens testified at the post-conviction proceedings; Adams did not. Davis makes the following claims that his two attorneys were ineffective at his capital-murder trial.
I. Claims of Ineffective Assistance at the Guilt Phase
Davis argues that his attorneys were ineffective at the guilt phase of his capital-murder trial. He lists several grounds in support of this contention.
A.
First, Davis argues that his attorneys were ineffective for failing to properly investigate and present an alibi defense.
*547 In his Rule 32 petition Davis alleged that counsel was ineffective for failing to call Tonya Heard and “anyone else” who was present at her house in the early evening on the day of the robbery/murder. Specifically, he asserted that these witnesses could have testified that Davis was at Heard’s house at the time of the murder and that he could not have committed the crime.
However, Tonya Heard was not called to testify at the Rule 32 hearing. Instead, Davis introduced the testimony of Cynthia Jacobs. Jacobs said that on the day of the murder Davis was at her house when she came home from work at around 4:00 p.m. and that he left the house at approximately 7:30 p.m. when her mother, Betty Jacobs, arrived home. (The robbery/murder occurred at approximately 7:15 p.m.) She said that Davis and numerous other friends were on her front porch most of that afternoon, that she went in and out of the house while she was cooking, that Davis was on the porch, and that it was possible that Davis left the porch but for only short periods. Jacobs also said that she never told anyone that Davis was at her house when Hazle was shot because “nobody asked.”
Giddens testified at the Rule 32 hearing that Davis told him about Heard but did not mention Cynthia or Betty Jacobs. He said:
“The only information Mr. Davis — and I will say, he provided me very little — was that he was with Tonya Heard. And that’s about all. That’s in my private conversations with him.”
(R. 149.) Attorney Giddens testified that when he spoke with Heard before trial
“[Ms. Heard] said that Mr. Davis had been at her house, they had played cards, that he left. When he came back, he had changed clothes and he was very nervous and that he was adamant to her that, ‘Now, I have been here all night.’ That’s what she told me. And based on her telling me that, I didn’t want to put her on the witness stand. Because this statement when you first see it, looks like a good witness for him. But when you talk to her, she didn’t tell me that at all.
“I don’t know what she was doing or why she didn’t tell the police that version, but I felt like it would be a big mistake to put her on the witness stand based on that.”
(R. 69-70.)
The court hearing Davis’s Rule 32 petition made the following findings of fact on this claim:
“In paragraph 21 of his second amended petition, Davis alleged that trial counsel failed to utilize witness Tonya Heard, who would have testified that Davis was visiting her home at the time of the Direct Oil shooting and that others were also present. Counsel is also faulted for not calling Sharon Christopher, another person who was allegedly present at Heard’s home at the time of the shooting.
“At the evidentiary hearing, Giddens testified that he interviewed Tonya Heard and determined that she would not make a good alibi witness. (RR. 68-70.) In fact, Giddens testified that he felt he was being baited into calling her so that the State could make his client look worse. Heard told him that after Davis left and came back to her residence later in the evening, he was insistent that she tell anyone who asked that he had been there all night. (RR. 69-70.) Because Tonya Heard never testified during the evidentiary hearing, Gid-dens must be given the benefit of the doubt as this Court will not second *548 guess his professional opinions formed after interviewing this witness.
“Having heard the testimony of Sharon Christopher, it is also clear that Gid-dens made a wise choice. In addition to what Giddens recalled Heard say during her interview, Christopher placed Davis leaving Heard’s house before 6:30 p.m., when the robbery occurred at 7:15 p.m. (R. 513, 607.) This inconsistency was a warning sign due to the fact Davis told Giddens he had been at Heard’s all night. (RR. 147-148.) In the light of the inconsistent testimony of the Jacobs at the Rule 32 hearing (RR. 260-266, 269, 277-282, 294-295), it is clear that Giddens made a wise choice not to call Heard or Christopher, even in the absence of the Petitioner carrying his burden of proof as to this issue.”
(C.R. 1143-44.) The circuit court’s findings are supported by the record.
Cynthia Jacobs’s testimony at the Rule 32 hearing was inconsistent with Davis’s statements to his attorneys and with Heard’s statements. As the Georgia Supreme Court stated in Adkins v. State, 280 Ga. 761, 632 S.E.2d 650 (2006):
“Counsel’s ‘decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel’s judgments.’ (Punctuation omitted.) Wiggins v. Smith, 539 U.S. 510(11), 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003). In Escobar v. State, 279 Ga. 727, 730, 620 S.E.2d 812 (2005), we held that trial counsel ‘was not ineffective for failing to discover a possible alibi witness of whom he was not informed.’ Here, trial counsel testified at the hearing on the motion for new trial that appellant did not inform him of the existence of any alibi witnesses. It is within the trial court’s discretion to resolve conflicting testimony between trial counsel and a defendant at a hearing on motion for new trial. Boyd v. State, 275 Ga. 772, 776, 573 S.E.2d 52 (2002); Fitz v. State, 275 Ga.App. 817, 825, 622 S.E.2d 46 (2005). Trial counsel’s performance cannot be deemed ineffective for failing to locate alibi witnesses whose existence was not brought to his attention. Esco-bar v. State, supra.”
280 Ga. at 762, 632 S.E.2d at 653.
“Defense counsel’s failure to investigate, interview, or present alibi witnesses does not amount to the ineffective assistance of counsel, because petitioner has failed to identify these witnesses, indicate their availability, or specify the content of their testimony. United States v. Green, 21 F.Supp.2d 521, 525 (D.Md.1998). Petitioner’s vague and speculative allegations that defense counsel was ineffective for failing to investigate alibi witnesses does not entitle him to habeas relief. See United States ex. rel. DeCreti v. Wilson, 967 F.Supp. 303, 307-308 (N.D.Ill.1997).”
Dell v. Straub, 194 F.Supp.2d 629, 650 (E.D.Mich.2002).
Moreover, “ ‘[confronted with the contradictions between what the members of the defendant’s family would testify to and what defendant himself had told counsel, [defense counsel] could reasonably have concluded that the presentation of this testimony would have been improper on his part. ... ’ ” People v. Calhoun, 351 Ill. App.3d 1072, 1080, 815 N.E.2d 492, 498, 287 Ill.Dec. 89, 95 (2004), quoting People v. Flores, 128 Ill.2d 66, 107, 538 N.E.2d 481, 498, 131 Ill.Dec. 106 (1989).
Accordingly, counsel was not ineffective for failing to conduct further investigation into Davis’s alibi defense and to locate Cynthia Jacobs, a witness whose testimony was inconsistent with Davis’s own statements to his attorneys. Thus, the circuit *549 court did not abuse its discretion in denying relief on this claim.
B.
Second, Davis argues that counsel was ineffective for failing to challenge the State’s case against him. The circuit court made the following findings of fact on this claim:
“Davis failed to carry his burden of proof as to this allegation in his second amended petition. The record shows that trial counsel challenged the State’s investigation and preparation of this case, including reviewing witness statements, discovery, visiting the crime scene, and speaking with Davis. In fact, this preparation paid off at trial when defense counsel prepared a defense that attempted to cast doubt on the veracity of the Phillips brothers [his codefen-dant§] and on Willie Smith. That this defense was not successful does not lessen its validity. The closing arguments of defense counsel at the guilt phase demonstrate how effective they were in preparing a defense. The use of Alphonso Phillips’s allocution against him — suggesting he was the trigger-man — is the stuff good defenses are made of. (R. 1210-1211.) Trial counsel also used the State’s evidence of the descriptions of the participants in the Direct Oil shooting in an attempt to establish a reasonable doubt as to Davis’s innocence. This defense strategy included calling a police officer to the stand to recount a physical description given immediately after the crime that was someone different from Davis’s description. This testimony, combined with the efforts to discredit the Phillips brothers, allowed defense counsel to argue that Willie Smith and the Phillips brothers were conspiring to frame Davis.
“As to paragraphs 24-29 in the second amended petition, Davis offered no evidence or argument that would be sufficient to meet his burden of proof in this case. As Davis has not established deficient performance or prejudice in this regard, this claim is denied.”
(C.R. 1147-48.) The circuit court’s findings are supported by the record.
We have reviewed the record of Davis’s trial. Davis’s codefendants Alphonso Phillips and Terrance Phillips testified that the three made plans to rob the Direct Oil gasoline station in Anniston and that Davis was carrying a .25 caliber semiautomatic pistol.[1] Alphonso testified that when they went into the gasoline station Davis pointed the gun at Johnny Hazle and fired two shots at him. Terrance said that he was supposed to be the lookout but that he walked away before they got to the gas station. He testified that he heard gunshots as he was walking away. Willie Smith testified that Davis told him that he had robbed and shot someone at the Direct Oil station. Still other witnesses testified that Davis had made statements to them concerning his involvement in the robbery/murder. The evidence against Davis was overwhelming.
Giddens testified at the Rule 32 hearing that “our strategy was [to] discredit the people who were there, show the jury the discrepancies in the height, weight, and actually try to establish a reasonable doubt that perhaps a co-defendant who had a motive to lie did it, not Mr. Davis.” (R. 150.) The record shows that counsel did an admirable job of attempting to discredit *550 the State’s -witnesses. As this Court stated on direct appeal:
“The appellant’s defense strategy consisted mainly of trying to discredit or to cast doubt upon the testimony of the state’s witnesses through cross-examination and arguments to the jury and to the trial court. By these means, he attempted to exploit differences as to some details in their testimony, attempted to persuade the jury that under the facts it was more likely that Alphonso did the shooting, argued to the jury and to the trial court that the facts surrounding the commission of the crime better fit the elements of the lesser included offense of felony-murder rather than with the offense of capital murder, and attempted to cast doubt upon the veracity of Alphonso, Terrance, and Smith (who was involved with the authorities in an unrelated case) by emphasizing the deals they had made with the state for lenient treatment in return for their testimony.”
Davis v. State, 718 So.2d at 1156. The record also shows that counsel made numerous objections and was able to secure a ruling excluding any reference to “gang activity.” Counsel vigorously attacked the State’s overwhelming evidence against Davis. That counsel was unsuccessful in failing to obtain an acquittal is not sufficient to find that counsel’s performance was ineffective.
“The fact that a particular defense was unsuccessful does not prove ineffective assistance of counsel. Chandler v. United States, 218 F.3d [1305] at 1314 [(4th.Cir.2000)]. ‘[C]ounsel cannot be adjudged incompetent for performing in a particular way in a case, as long as the approach taken “might be considered sound trial strategy.’” Chandler, 218 F.3d at 1314 (quoting Darden v. Wainwright, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986)).”
Brown v. Crosby, 249 F.Supp.2d 1285, 1321 (S.D.Fla.2003). The circuit court did not abuse its discretion in denying relief on this claim.
C.
Third, Davis argues that his attorneys were ineffective for failing to object to what Davis says was irrelevant and prejudicial evidence. He argues that counsel should have objected to the admission of a letter found in Davis’s pocket that referred to gang activity and to Shannon Wilson’s testimony.[2] Wilson testified that she overheard a conversation between Davis and Willie Smith in which Davis said that he shot and killed Hazle.
The circuit court found that Davis failed to meet his burden of proof on this claim because no evidence was introduced at the evidentiary hearing concerning this issue. We agree. Counsel was not questioned concerning this evidence.
“This court has held that ‘[objections are a matter of trial strategy, and an appellant must overcome the presumption that “conduct falls within the wide range of reasonable professional assistance,” that is, the presumption that the challenged action “might be considered sound trial strategy.” Moore v. State, 659 So.2d 205, 209 (Ala.Cr.App.1994), citing Strickland [v. Washington], 466 U.S. [668] at 687-88, 104 S.Ct. [2052] at 2064-65 [ (1984) ].’ ”
Lane v. State, 708 So.2d 206, 209 (Ala.Crim.App.1997). As we stated in Brooks v. State, 456 So.2d 1142, 1145 (Ala.Crim. *551 App.1984), “effectiveness of counsel does not lend itself to measurement by picking through the transcript and counting the places where objections might be made. Effectiveness of counsel is not measured by whether counsel objected to every question and moved to strike every answer.” Davis failed to meet his burden of proof on this claim; therefore, the trial court correctly denied him relief.
D.
Fourth, Davis argues that counsel was ineffective for failing to ensure that the record of the proceedings in the lower court was fully recorded. Specifically, he asserts that counsel erred in failing to have his preliminary hearing recorded and for not ensuring that sidebar conferences were recorded.
The circuit court made the following findings on this claim:
“In paragraph 38, Davis alleges [ineffective assistance of counsel] based on trial counsel’s failure to move for full recordation of all proceedings in his capital murder trial. Davis failed to prove that he was prejudiced by the lack of transcription of certain sidebars during the course of trial. Although Giddens testified, the subject of whether any controversial rulings or prejudicial comments were made during these sidebars was not addressed. This Court, which presided over Davis’s capital murder trial, cannot recall anything discussed during sidebars that would have prejudiced Davis due to their lack of transcription. Because Davis did not put forth evidence to support this claim, it is denied.”
(R. 1151-52.)
At the Rule 32 hearing, Davis asked Giddens why he did not move to have the preliminary hearing transcribed. The following occurred:
“[Rule 32 counsel]: Do you make a strategy decision not to make that motion or have you just never ' thought about making that motion?
“[Giddens]: When the only witness really is going to be the investigating officer, you find out what you need to know, I mean, he’s charged with killing a man at a gas station, Direct Oil here in Anni-ston. And that was pretty much the testimony. And I believe the officer testified what the codefendants had told him.”
(R. 31-32.) Davis made no attempt to show how he was prejudiced by counsel’s failure to have the preliminary hearing or certain sidebar conferences recorded. There are no allegations that the officer’s testimony at the preliminary hearing was inconsistent with his trial testimony or that the sidebar conferences contained omitted information that prejudiced Davis. “It is incumbent upon [petitioner] to show some prejudice from the failure to transcribe the preliminary hearing testimony before it may be claimed to be ineffective assistance of counsel. Spilman v. State, 633 P.2d 183 (Wyo.1981).” Jennings v. State, 806 P.2d 1299, 1307 (Wyo.1991). The circuit court correctly denied relief on this claim.
E.
Fifth, Davis argues that counsel failed to object to improper prosecutorial arguments that, he says, were made in closing. Specifically, he asserts that the prosecutor improperly commented on the fact that Davis did not testify.
The circuit court made the following findings on this claim:
“In paragraph 43, Davis alleges [ineffective assistance of counsel] because the prosecutor allegedly drew attention to the fact that Davis did not testify, without objection from defense counsel. The *552 contention that the prosecutor improperly commented on Davis’s failure to testify was reviewed and rejected by the Supreme Court of Alabama. Ex parte Davis, 718 So.2d 1166, 1174 (Ala.1998). Having failed on the underlying issue on direct appeal, Davis cannot succeed by relitigating this issue in the guise of [ineffective assistance of counsel]. See, Williams [v. State], 783 So.2d 108, 133 (Ala.Crim.App.2000) (‘Because we determined that the remarks did not constitute plain error even if objectionable, appellant cannot relitigate the issue under the guise of ineffective assistance of counsel in a post-conviction proceeding. A finding of no manifest injustice under the “plain error” standard on a direct appeal serves to establish a finding of no prejudice under the test for ineffective assistance of counsel provided in Strickland v. Washington [, 466 U.S. 668 (1984) ].’). Because the underlying issue lacks merit, counsel could not have been ineffective in this regard. See Card v. Dugger, 911 F.2d 1494, 1520 (11th Cir.1990) (‘Counsel cannot be labeled ineffective for failing to raise issues which have no merit.’).”
(R. 1152-53.)
Initially we note that the circuit court erroneously relied on a decision by this Court, Williams v. State, 783 So.2d 108 (Ala.Crim.App.2000), that was later reversed by the Alabama Supreme Court. However, the circuit court issued its order before the Supreme Court released Ex parte Taylor, 10 So.3d 1075 (Ala.2005). The Taylor court held:
“Although it may be the rare case in which the application of the plain-error test and the prejudice prong of the Strickland [v. Washington, 466 U.S. 668 (1984) ] test will result in different outcomes, a determination on direct appeal that there has been no plain error does not automatically foreclose a determination of the existence of the prejudice required under Strickland to sustain a claim of ineffective assistance of counsel.”
Taylor, 10 So.3d at 1078.
On direct appeal the Supreme Court stated the following concerning the prosecutor’s argument in closing:
“After reviewing the State’s comments in their full context, we cannot hold that they would naturally and necessarily be construed as an attack on Davis’s decision not to testify on his own behalf; rather, they could well be construed as a form of cohesive rebuttal to defense counsel’s theory that the witnesses against Davis were lying in order to rid themselves of involvement in the crime.”
Ex parte Davis, 718 So.2d 1166, 1174 (Ala.1998). The Alabama Supreme Court specifically found that the prosecutor’s comments were not improper. “The sixth amendment right to effective assistance of counsel does not require counsel to raise every objection without regard to its merit.” Palmes v. Wainwright, 725 F.2d 1511, 1523 (11th Cir.1984). See also Thomas v. Jones, 891 F.2d 1500 (11th Cir.1989) (counsel not ineffective for failing to object to admissible evidence). Therefore, counsel was not ineffective for failing to object to a prosecutor’s proper argument.
Moreover, whether to object is a matter of trial strategy. “[C]ounsel’s failure to object to the prosecutor’s summation represents his tactical decision to avoid underscoring the prosecutor’s statements so as to draw the jury’s attention to them.” Gatto v. Hoke, 809 F.Supp. 1030, 1039 (E.D.N.Y.1992). Relief was correctly denied on this claim.
*553 II. Claims of Ineffective Assistance at the Penalty Phase
Davis next argues that his attorneys were ineffective in the penalty phase of his capital trial. We stated in our previous opinion affirming the circuit court’s denial of Davis’s Rule 32 petition that if this issue had been properly before us we would direct that a new sentencing hearing be conducted. Davis v. State, 9 So.3d at 526. However, upon further research and review of the record we have reconsidered our comments in dicta in our previous opinion, and we now conclude that the circuit court did not abuse its discretion in denying Davis relief on his claims of ineffective assistance of trial counsel at the penalty phase.
The circuit court made very detailed findings of fact on this issue, and we quote extensively from its order:
“In this claim, Davis has alleged that his trial counsel were ineffective in regard to the penalty phase of his trial. Quite simply, this claim can only be described as bizarre, based on the fact that [Davis’s] own family seems to have concealed important information from trial counsel. Having considered the petition, having carefully reviewed the evidence presented at this hearing, as well as at the trial, and following the law governing Sixth Amendment claims — including the recent decision in Wiggins v. Smith, [539 U.S. 510] (2003) — the court finds that this claim is due to be denied.
“This finding is not meant to imply that the Court did not find compelling some of the mitigation evidence presented by [Davis] during the evidentiary hearing. Much of the evidence presented at the Rule 32 hearing focused on abuse inflicted on Davis by his mother, Lillie Bell-Davis. The Court finds that Davis was abused by his mother to an extent that would have rendered it relevant to the issue of the appropriate penalty determination in this case under existing law, though the Court, as explained below, finds that this evidence is insufficient to establish prejudice.
“The Court’s major concern, however, is that if this Court used this evidence to find the existence of deficient performance the Court would be engaging in the inappropriate activity of judging the performance of trial counsel through the use of hindsight. Further, the Court would be passing judgment on Attorney Adams without the benefit of his testimony. Even worse, this Court would be inappropriately shifting the blame for the inexcusable actions of Davis’s family, particularly his mother, to his trial counsel. This Court must judge trial counsel’s performance through their perspective at the time. That being the case, the Court does not find that trial counsel’s performance was deficient.
“To the contrary, Jimmy Davis’s family — and to a very large extent his mother — bears a heavy burden in this case for their role in this matter. Because Adams did not testify, this Court does not know what Adams did or did not do in preparation for this case. The Court presumes, however, that Adams acted reasonably in the questions he asked his client and his client’s mother and in preparing for the penalty phase. Further, the testimony of Giddens establishes that at no time did Davis ever mention to his attorneys the abuse suffered at the hands of his mother or the intervention of DHR [the State Department of Human Resources] in the Davis home.
[[Image here]]
“Further, the record establishes, by [Davis’s] own admission, that trial counsel did talk to two of Davis’s siblings. *554 (RR. 863.) Further, even in the time-frame immediately before the evidentia-ry hearing, Davis did not speak in detail of the abuse inflicted on him as a child, instead generalizing that his background ‘wasn’t rosy1 and that he didn’t have any privileges, only ‘every day survival.’ (RR. 863.) When specifically questioned about abuse, Davis only acknowledged that he was disciplined with a switch, in stark contrast to the evidence that Davis was, in fact, hit with belts, electrical cords, and with an open hand. (RR. 863-864.) As noted by Dr. [Glenn] King, [a psychologist,] ‘He was not — he was not too forthcoming. I had to ask a number of questions about that.’ (RR. 863-864.) Thus, the record supports a finding that even Davis continued to participate in the family’s conspiracy of silence, even on the eve of his evidentia-ry hearing.
“The Court also takes notice of the Petitioner’s request, via motion to the Court, to keep the documents and evidence concerning [Davis’s] abuse sealed. As noted by counsel for [Davis], this was done out of the family’s concern for their privacy. (RR. 161-163.) It was this desire by the family to keep this matter private — in addition to their fear of Lillie Bell-Davis — that the witnesses before this Court during the evidentiary hearing noted was the reason behind their years of silence. Although [Davis’s] motion to keep these records private is not ‘evidence’ in the formal sense of the word, it does allow this Court to once again view the family machinery that trial counsel were up against in this ease, machinery that even collateral counsel had to deal with in this matter.
“Further, this Court noted during the evidentiary hearing that Lillie Bell-Davis failed to make an appearance during the entire week this matter was heard. Although Lillie Bell-Davis attended Davis’s capital murder trial, she was noticeably absent as a witness or a spectator during the entire week of the evidentiary hearing. Although the Court can infer why Ms. Davis would choose not to come into court once this secret was made public, it certainly sheds light on the type of person Ms. Davis is and the type of person trial counsel were misled by. In any event, it is difficult for this Court to view the preparation of trial counsel through them eyes when the very people (Lillie Bell and the two, unnamed siblings) who were giving trial counsel information— apparently misleading information— were not called to recount their conversations with Giddens and Adams.
“Giddens testified that he felt that he had a family history from talking to the mother. The Court assumes that additional information was obtained from the two siblings interviewed by trial counsel. Counsel learned where Davis had gone to school, that he received his GED from Tuskegee, how he grew up, that Davis’s father had died, the parents had been divorced. (RR. 97.) Davis’s friends, that trial counsel were aware of, were the same people who testified against Davis at his capital murder trial: A1-phonso Phillips, Terrance Phillips, and Willie Smith. Other acquaintances included Tonya Heard, who was not a good witness due to the fact that Davis had attempted to manufacture an alibi story with her, something she refused to participate in. Looking at the witnesses who testified at the evidentiary hearing, namely Cynthia and Betty Jacobs and Geneva Davis, there is nothing to suggest that the above-named individuals were not Davis’s friends at the time of his arrest. The others in Davis’s life, including his sisters Mary Nell and Hor- *555 tense, had been out of Davis’s life for some time before this murder and would not be considered close friends or acquaintances in the sense of people who spent a good deal of time with Davis on a day-to-day basis in the year or so leading up to Hazle’s murder. Thus, trial counsel had a distinct disadvantage in that Davis’s friends made up the potential witnesses against him.
“Further, as noted above, these friends do not appear to have had knowledge of Davis’s upbringing. Instead, the abuse information was a closely held secret kept within the family by a manipulative Lillie Bell-Davis. Thus, not only was trial counsel’s decision not to call Davis’s friends a reasonable one under the circumstances, Davis has not been prejudiced in regards to this abuse information by counsel’s failure to call them on his behalf.
“According to Wiggins v. Smith, [539 U.S. 510] (2003), this Court has to make a determination of whether the background investigation — which includes ‘a context-dependent consideration of the challenged conduct... from counsel’s perspective at the time’ — was reasonable. Based on the factors facing trial counsel, most notably Lillie Bell-Davis, this Court finds that trial counsel acted reasonably, and were misled by the Petitioner’s own family.
“Trial counsel felt they had a reasonable idea of Davis’s background from them interaction with [Davis’s] mother. Generally speaking, mothers are the best advocates a son could have in difficult times. If you want to phrase it as judicial notice, this Court takes judicial notice that ordinarily there are few bonds stronger than a mother’s love for her child. There has been nothing presented to this Court that suggests that [Andre] Sigler, [Davis’s first cousin,] Davis’s siblings, or Davis himself ever alerted trial counsel to the fact that Lillie Bell-Davis was not a typical loving mother.
“Davis did not help his counsel, either. As the United States Supreme Court noted in Stoicldand [v. Washington, 466 U.S. 66 (1984) ]:
“ ‘The reasonableness of counsel’s actions may be determined or substantially influenced by the defendant’s own statements or actions. Counsel’s actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information. For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably altogether diminished or eliminated.’
“466 U.S. at 691. See also, Chandler [v. United States], 218 F.3d [1305] 1319 n. 24 [ (11th Cir.2000) ] (‘when the circumstances of a claim make these conversations relevant, the petitioner can rarely (if ever) satisfy his burden to disprove the presumption of effective assistance without disclosing the substance of these attorney-client conversations.’). Guldens testimony was that Davis did not speak of any sexual abuse. [Davis] did not question Giddens about what Davis precisely told his trial counsel concerning his background, but there is no evidence that Davis, his mother, or his siblings in Anniston, Alabama, did anything to put his attorneys on notice of the existence of any abuse. See, Williams v. Head, 185 F.3d 1223, 1235 (11th Cir.1999) (‘Given the lack of clarity of the record, we presume that [Attor *556 ney] Allen talked with [Client] Williams as part of his effort to ascertain whether there was any mitigating circumstance evidence that Collins had failed to present. We are comfortable with doing so because Allen is an experienced criminal defense attorney.... There is no reasonable possibility that Allen.. .would have neglected to talk with his client about mitigating circumstances.’).
“Looking at Giddens’s testimony and the trial testimony of Lillie Bell-Davis, much of the background information given by Davis’s family was true, but given with Ms. Davis’s personal ‘spin’ on it, omitting the important portions of Davis’s life in which he was beaten by a belt or switch. The information concerning Davis’s participation in the job corps, obtaining his GED at Tuskegee, the death of his father, his parents’ marital difficulties, are all items that Lillie Bell told counsel about and was willing to testify about. Thus, trial counsel did obtain much of this information through the most obvious source: Davis’s mother.
“Although Davis faults trial counsel for not subpoenaing his DHR records, there is absolutely no evidence before this Court that reasonably competent counsel would have been on notice that such records existed. There are no constitutionally required checklists for mitigation investigations. Trial counsel are faced with the realities of limited time and limited resources. Those resources have to be managed in an efficient manner. Thus, this Court does not find that attorneys are expected to subpoena agency records just in case. Had Lillie Bell-Davis, Davis’s siblings, or Davis himself told his trial counsel that this issue needed to be investigated — that DHR had been involved in the Davis home — this Court would absolutely find ineffective assistance of counsel for failure to investigate, discover and/or develop this evidence, depending on the strategic decisions made by counsel following their investigation. But that is not what happened here.
“Davis is asking this Court to declare two competent trial lawyers incompetent due to the fact that they were manipulated by Lillie Bell-Davis, the Davis family, and Davis himself due to the family’s conspiracy of silence. Quite simply, it is not trial counsel’s fault, it is the fault of [Davis], of his mother, of Andre Sigler, and of the Davis family as a whole; a family that apparently sought collateral counsel’s assistance in keeping these facts private, even during the time leading up to the evidentiary hearing in this matter.
“Davis’s petition suggests that had trial counsel requested an investigator [and assumes one would have been appointed] this evidence would have been discovered. The facts proved by [Davis] surrounding the presentation of the evidence of abuse during his upbringing do not bear this out.
“Davis’s trial occurred during the period when the United States Supreme Court’s decision in Ake v. Oklahoma, 470 U.S. 68 (1985) (holding that an indigent accused is entitled to a mental health expert upon a sufficient showing that it is required under principles of fundamental fairness), was having its exact parameters settled by various courts, including this State’s courts. Ex parte Sanders, 612 So.2d 1199 (Ala.1993) (extending Ake beyond mental health experts for this first time). Thus, unlike today, it was unclear at that time whether a private investigator would qualify as the type of expert assistance envisioned under the Ake jurisprudence. Further, even under Sanders, which dealt with a ballistics expert — a strong *557 showing was required that such assistance was a matter of fundamental fairness. The law in 1993 was not clear cut that an investigator would be appointed just because one was requested. Counsel cannot be faulted for failing to see developments that would occur 10 years down the road.
“[Davis] has made no showing that trial counsel had sufficient grounds to request the assistance of an investigator. Neither Davis nor his family gave his trial counsel any information that would have suggested an investigator was needed for the mitigation preparation. Davis’s family, most notably [Davis’s] own mother, gave trial counsel a deliberately misleading social history, omitting the abuse and involvement of DHR in their home. Davis did nothing to inform his trial counsel of his mother’s past behavior. This Court, then, cannot find that trial counsel had any reasonable basis to believe that an investigator was needed in this case.
“Although this Court was left without the benefit of Adams’s recollection of the preparation for the mitigation phase— and thus assumes Adams performed reasonably — the Court is aware that Giddens approached the penalty phase preparation with the reasonable understanding that Calhoun County is a conservative, law-abiding community. (RR. 155.) As such, Giddens was predisposed to believe that in ordinary cases alcohol and drug use is a double-edged sword when used as potential mitigation. (RR. 156.) The Court finds this to be a reasonable theory for defending a case in this county. Giddens also understood that in mitigation one has to be careful about the evidence that is presented, because sometimes it will backfire. (RR. 158.) In his opinion, Giddens stated that in many cases a plea for mercy from the family is the best chance a capital defendant has in Calhoun County. (RR. 158.) The Court does not find anything unreasonable about Giddens’s beliefs.
“Because the Davis family, including [Davis], withheld critical information concerning the family’s secret, abusive past from trial counsel, the Court concludes it was reasonable for trial counsel to assume that a plea for mercy in this case was Davis’s best option. Having a mother testify that she raised her son without a father or public assistance, that Davis’s father died while Davis was visiting him, and testify about Davis’s reaction to his father’s death was a competent attempt to humanize [Davis] pri- or to the request for mercy.
“Further, this Court has not been shown that Davis was prejudiced by the failure of trial counsel to obtain an investigator. What this Court saw during the evidentiary hearing was the product of at least two investigators, a mitigation specialist, a social worker, at least five attorneys, a paralegal, a psychologist, a neuropsychologist, and a (belatedly) cooperative family. The Court cannot, and does not, accept that the evidence brought before the Court would have been discovered by one investigator when [Davis] used at least three investigators and a social worker to develop these witnesses and this information. Even with this large team of assistants, many of [Davis’s] witnesses were located and contacted during the weeks leading up to the evidentiary hearing, which had been continued on several prior occasions and after the petition had been pending for several years. (RR. 129, 271, 373, 433, 441, 501-502.)
“As for reaching a prejudice determination on the IAC [ineffective-assistance] claim for failing to obtain an investigator, there is no evidence before *558 this Court as to how collateral counsel, the investigators, or others knew that any DHR records existed. Did collateral counsel request the DHR records ‘just in case’ and get evidence of abuse that allowed them to break the family’s wall of silence? The request for discovery does not state any specific information that indicated that collateral counsel knew such evidence existed prior to requesting such information. As noted above, trial counsel are not required to subpoena records ‘just in case’ if there is no reason to believe such records exist.
“Did Davis’s family decide to break ranks with Lillie Bell-Davis — who did not appear at the hearing as a spectator or witness during the evidentiary hearing to break the wall of silence after seeing that Davis had been sentenced to death? If so, that motivation would not have been available to trial counsel, who was misled by the Davis family during their preparation of this case. Even after Davis’s jury recommended the death penalty, Lillie Bell-Davis continued her manipulative efforts as evidence by her failure to disclose this information to the Pardons and Paroles officer who prepared the PSI [presentence report]. Underscoring the difficulties trial counsel had in getting useful information from their client, Davis failed to cooperate with the preparation of the PSI report. Again, the record establishes that this family set about to cover up past incidences that they did not want the outside world to know about.
“Under these circumstances, putting forth this information in an evidentiary hearing is not the equivalent of proving that an investigator, had one been approved by this Court on the required showing under Ake and Sanders, would have uncovered this information. The family (including [Davis]) controlled this information and the family controlled
when and under what circumstances this information would be relayed to those who were trying to save Davis’s life.
“Likewise, this Court rejects Davis’s contention that trial counsel were ineffective for failing to request the services of a social worker. This Court notes that social worker involvement in capital cases is a relatively recent development in capital litigation. It was certainly not anything this Court recalls as being routine or common in capital cases in this county or other nearby counties in 1993. In fact, this Court cannot recall a specific case where a social worker was employed during the time period before Davis’s capital murder trial. This is borne out by Jan Vogelsang’s testimony that her involvement in Alabama death penalty cases did not start until the time frame following Davis’s trial. (RR. 1049.) Further, Vogelsang noted that her involvement in these cases has been limited to work in post-conviction proceedings or nonjury proceedings. (RR. 1049.)
“The testimony of Vogelsang falls far short of establishing that social workers were on the ‘ask about’ or ‘must seek’ list of all reasonable defense attorneys in this area in 1993. See, Housel v. Head, 238 F.3d 1289, 1296 (11th Cir. 2001). As this Court is unaware of any social workers being used in the fashion suggested by the petition during this time frame, it is unclear how this Court could possibly find that no competent counsel would have failed to seek and utilize the services of a social worker. There is no merit to this contention.
“Further, this Court finds the use of a social worker to be less than an ideal procedure. Vogelsang came into Court and testified on behalf of several family members in Davis’s family who did not appear before this Court. During her *559 testimony, Vogelsang continually assigned mental operations to witnesses who were never brought into Court to be subjected to cross-examination. (RR. 1061.) Just one example of this can be found on pages 961-962 of the evidentia-ry hearing transcripts where Vogelsang testified that Lillie Bell-Davis constantly got pregnant because ‘she had some unusual ideas about physical health. And she thought pregnancy was a way to get healthy and not have so many medical problems.’ (RR. 961.) Another example is found earlier in her testimony where she testified, ‘[Ajnother idea that Lillie Bell had that was cultural in nature, was that if you — if children had clean clothes and you could pay their fees at school, then their was nothing else you had to do, that they would just sort of automatically go through and graduate. So some of these ideas she had certainly were cultural.’ (RR. 953.)
“Although [Davis] correctly noted that the Alabama Rules of Evidence are relaxed in penalty-phase proceedings, pursuant to statute, this type of testimony is certainly of the sort that pushes the envelope of permissible evidence. While arguably probative and relevant to sentence, such testimony does not seem particularly suited to have great weight placed upon it. This Court, or a jury during an actual penalty phase hearing, is being asked to accept the facts as interpreted and sifted by a third-party in reaching a conclusion.
“Vogelsang is a professional witness, in the sense that she goes out and interviews many different people, decides what is relevant or not, and then comes into Court and places that information before the fact-finder while insulating the actual witnesses from cross-examination. Even though this is permitted, such a process must necessarily result in a lessened weight [being] given at times to such testimony. For example, while this Court does not doubt that someone told Vogelsang that Lillie Bell-Davis lit the curtains of Davis, Sr.’s boarding house on fire, lit Davis Sr.’s shirt on fire, and then fled New York state, it seems that such an incident would be inconsistent with Lillie Bell not being charged with a crime, with none of the family members at the evidentiary hearing testifying about this event, or with Davis Sr.’s continuing involvement with Lillie Bell-Davis. Ms. Vogelsang obviously believed this story based on who she spoke with to get this information, but without the ability to decide whether this is fact or fiction through judging the credibility of the person(s) with firsthand knowledge, the Court cannot, and will not, give such anecdotal testimony great weight in its prejudice determination.
“Further, this Court has no knowledge of why the family suddenly broke their conspiracy of silence when dealing with Vogelsang. A very possible motivation is the fact that Davis was sentenced to death and the family decided that they had to do something to try and save his life, after the fact. If this was the family’s motivation, a social worker would not have benefited trial counsel before Davis’s capital murder trial, because there is no indication the family would have opened up about this family secret. Whereas Vogelsang was dealing with a cooperative family, Davis’s trial counsel did not have such an advantage.
“Next, Davis alleges [ineffective assistance of counsel] based on trial counsel’s failure to get a psychologist to conduct a mental evaluation, rather than having him tested by a psychometrist. This claim, too, fails.
“First, trial counsel did not request that the evaluation be conducted by a psychometrist, nor did this Court’s or *560 der state that the evaluation should have been done by a psychometrist. Instead, due to an administrative error at the mental health center, Davis was assigned to Annie Storey, a psychometrist, for evaluation. (RR. 129.) Although trial counsel did not request this procedure, Giddens testified that Storey, ‘did exactly what I asked her to do.’ (RR. 93.) Namely, Giddens testified that he was concerned mostly with Davis’s IQ and achievement level.
“Under the circumstances of this case, defense counsel’s concern about IQ and achievement level testing was reasonable. As Giddens recounted, there was no special plea in Davis’s case and nothing had struck either Giddens or Adams as peculiar about Davis’s mental state. Giddens did not believe that Davis was incapable of assisting in his defense, and did not believe that Davis had any mental problems. Davis did not provide any evidence at the evidentiary hearing that would suggest otherwise. Accordingly, there is no basis for this Court to conclude that reasonably competent trial counsel would have been concerned about Davis’s mental health, other than information that might be useful for mitigation.
“Trial counsel was not looking to prove the statutory mitigating circumstances of ‘extreme mental or emotional disturbance’ or substantial impairment of his ability to conform his conduct to the requirements of the law,’ just as Davis did not do so in the evidentiary hearing. Further, had Davis’s IQ been lower (or had the United States Supreme Court made Atkins [v. Virginia, 536 U.S. 304 (2002),] applicable to individuals in the borderline range of intelligence), trial counsel’s strategy would be celebrated as genius by collateral counsel today. There was nothing unreasonable about getting a IQ and achievement levels before the jury.
“In addition, even though trial counsel were not responsible for the assignment of a psychometrist to this case, trial counsel were under the impression that Storey’s report had been reviewed and approved by Dr. Clarence McDanal, a licensed psychiatrist. Although McDa-nal testified at the evidentiary hearing that his review was merely an ‘administrative sign-off,’ there is nothing to impute this knowledge to trial counsel. Reasonable trial counsel could have trusted that a clinic of mental health professionals would be run with more efficiency than the picture painted by Dr. McDanal. Because Storey did exactly what trial counsel wanted her to do, it was reasonable for trial counsel to accept her work and accept the representations of the clinic that her work had been reviewed by a licensed psychiatrist.
“Finally, Davis was not prejudiced by Storey’s work in this case. First, Dr. King, an experienced forensic psychologist with a great deal of experience testifying in Alabama criminal cases, testified that he would not have referred Davis for any further testing or evaluation. In addition, the law allowed Sto-rey to refer Davis for further evaluation or testing if she felt it was necessary. Ala.Code § 34-26-l(c)(l)(b). That she did not do so corroborates the findings of Dr. King.
“The Court notes that, notwithstanding Dr. King’s testimony, [Davis] could argue that Storey was not trained to know when referral to a neuropsychologist was necessary or indicated. This argument, however, is not persuasive. Although Dr. [Kimberly] Ackerson, the psychologist who testified for Davis, stated that she would have referred Davis to a neuropsychologist for further *561 evaluation, she also indicated that the results of the testing were not enough for her to reach that conclusion. (RR. 716.) To reach the conclusion that a referral to a neuropsychologist was necessary, Ackerson stated that she would have needed a social history.
“Ackerson’s testimony that she would have referred Davis to a neuropsychologist is based on the premise that she would have had an accurate social history. As noted above, Davis’s family was not in the mood or habit of giving accurate social histories in 1993. Even Davis himself gave a watered down version of his social history to Dr. King in the months prior to his evidentiary hearing. He did not cooperate with his trial counsel or in the preparation of the [pre-sentence] report. Thus, the social history that would have been given to a psychologist in 1993 is the same social history that was spoon fed to trial counsel by Davis’s family, intent on concealing their history of abuse. Accordingly, this Court cannot find that Davis would have been referred to a neuropsychologist had his evaluation been completed by a psychologist rather than a psy-chometrist.
“Finally, this Court finds that the substantive evidence presented at the evi-dentiary hearing does not establish prejudice under Strickland. Although it is clear that Davis suffered some abuse as a child, he was never hospitalized, DHR did not remove him from the home, and the abuse by Lillie Bell was remote in time to the murder of Hazle. This evidence, when considered with the facts of this crime, do not rise to the level necessary to establish prejudice.
“This Court found the existence of two aggravating circumstances: prior conviction of a crime involving use or threat of force against the person and murder committed during the course of a robbery. In mitigation, this Court found the existence of only one statutory mitigating circumstance: the age of the defendant at the time of the crime [23 years]. Having reviewed the evidence presented at the evidentiary hearing, this Court does not find that the substantive evidence from the evidentiary hearing, if presented at Davis’s sentencing would have altered these statutory findings.
“The substantive mitigation evidence presented during the evidentiary hearing in support of the [ineffective assistance of counsel] claims was of the non-statutory type. The Court does not find that this evidence changes the original finding that Davis had the capacity to appreciate the criminality of his conduct and to conform his conduct to the requirements of the law and that he did not act under the influence of extreme mental or emotional disturbances during the commission of the crime.
“Not only does the evidence offered at the evidentiary hearing fail to support a finding of either of these statutory mitigating circumstances, the evidence presented at the trial disproves the existence of these circumstances. The evidence shows that this crime was planned in advance and not the product of behavioral aberration. Further, the evidence supports a finding that Davis’s motive was to seek money from the Direct Oil station, and not the result of a mental or emotional breakdown or disturbance. Further, the evidence shows that the victim was shot when he failed to hand over the money fast enough and instead smiled at [Davis]. [Davis] has not shown a direct link between the proffered mitigating evidence and the commission of this offense.
“Instead, this evidence is of the sort consisting of ‘any aspect of a defendant’s *562 character or record... that the defendant offers.as a basis for a sentence of life imprisonment without parole instead of death.’ Ala.Code § 13A-5-52 (1975). Had Davis’s family revealed this information to trial counsel, rather than concealing it, this information would have been properly introduced as non-statutory mitigation. Further, it would have been entitled to some weight in the consideration of the proper sentence in this case.
“Its weight, however, would not be sufficient to create a reasonable probability as to the outcome of [Davis’s] sentence. The abuse suffered by Davis was remote in time, about five or six years, to the commission of this offense. (RR. 512.) Further, this offense was committed after Davis had just previously committed a robbery in the third degree. The abuse was of the sort that Davis’s family hid it from the outside world for years, even going so far as to hide it from Davis’s counsel. [Davis] himself participated in the family’s silence. Even immediately before the evidentiary hearing, Davis had to be prodded for information about the prior abuse. (RR. 863-864.) The extent of Davis’s commentary on this abuse was ‘he felt that sometimes ... he was disciplined too much.’ (RR. 864.)
“Another aspect of these facts that decreases the weight this mitigation evidence would have is the fact that the abuse DID NOT lead any of Davis’s family members to report Lillie Bell’s actions to authorities, to tell people outside of the family, or otherwise remedy the situation. Further, in the one formally documented case of abuse before the Court, DHR made a decision to leave Davis in the home. Regardless of the hindsight and speculation offered by various DHR employees at the eviden-tiary hearing, the fact remains that as of 1993 the evidence would have been that DHR never actually took measures to have Davis removed from the home due to abuse. This decision has a direct impact on the weight to be afforded this evidence.
“When combined with the fact that Davis’s family members were comfortable with keeping this information secret, this abuse becomes much less powerful as evidence. Davis’s family must not have thought his life was in danger during his adolescence, as they did nothing to protect him from further abuse. Instead, they let family pride, fear of Lillie Bell, or other factors preclude them from coming forward. Even at the hearing, these witnesses were still hesitant to come forward and discuss these issues. The abuse of Davis obviously did not impact Davis’s own family to a degree great enough where they were motivated to seek assistance from authorities in dealing with the issue. This Court, as well as a jury, would have to consider such factors in determining the weight to be given this evidence.
“Based on the testimony of Storey at the original sentencing hearing, this Court considered the difficulty of Davis’s upbringing and his below-average intellect. While this new evidence puts this information in a new perspective, it does not change the fact that the facts of this crime and the two aggravating circumstances proven by the State far outweighed the one statutory mitigating factor and these non-statutory mitigating factors.
“Likewise, some of the evidence presented by [Davis] falls into the category of ‘double-edged sword’ type evidence referenced by Giddens. (RR. 156, 158.) For example, some of the evidence indicated that Davis had good role models in his life. One of Davis’s own witnesses *563 noted that his violent behavior did not begin until the commission of the Robbery III offense prior to the Direct Oil murder. (RR. 994-995, 1006.) This information leads to an inference that Davis’s violence was a product of some factor other than his upbringing, considering the testimony that throughout Davis’s childhood (when the abuse occurred) he was not a violent person. Instead, he became violent when he committed the Robbery III of a Domino’s Pizza employee and began fighting in jail and became aggressive and disrespectful. (RR. 1006.) Such testimony does not suggest that the abuse suffered by Davis was of any great mitigation significance as his violent criminal behavior does not begin until years later after he is away from his mother and her influence.
“This Court does not accept that the behavior of Lillie Bell-Davis in abusing [Davis] or misleading his trial counsel was appropriate. The Court’s finding of no [ineffectiveness of counsel] is not an approval of such behavior. Instead, it is a recognition that no matter how wrong her behavior was, trial counsel were not responsible for the family’s (and Davis’s) silence on this issue and the abuse inflicted by Lillie Bell — while wrong'— does not serve as mitigation evidence that would have created a reasonable probability that the outcome of Davis’s penalty phase would have been different. Accordingly, in addition to finding that counsel’s performance was reasonable under the circumstances, the Court further finds that Davis did not prove prejudice in any event.
[[Image here]]
“For the foregoing reasons, the Court denies this claim. Although the Court acknowledges that this abuse evidence should have been brought out at Davis’s trial, the fault for it not coming out rests with Davis and his family, and not his counsel. It would pervert Sixth Amendment jurisprudence to punish lawyers for deliberate misdeeds by their client and client’s families. The record before the Court establishes a family that is coming to terms with their past. The problem is that they chose to do so only after [Davis] was sentenced to death. That this secret was more valuable to them than the potential risk of their silence to Davis at his capital murder trial is disturbing, but it is not the result of ineffective assistance of counsel. This claim, in its entirety, is denied.”
(Capitalization in original.) (R. 1160-91.) The circuit court’s findings are supported by the record, and we adopt them as part of this opinion.
A.
First, Davis argues that counsel should have discovered and presented evidence from family members and the Department of Human Resources (“DHR”) records to show that he had been abused as a child.
At the penalty phase, counsel called Davis’s mother, his first cousin, and a counselor who had evaluated Davis’s IQ. On direct appeal we stated the following about the mitigating evidence that was presented:
“[Davis] called three witnesses: his mother, Lillie Bell Davis; his first cousin, Andre Lamont Sigler; and a counselor, Annie M. Storey. His mother testified generally about [Davis’s] background and family life. She stated that she and her husband, who was [Davis’s] father, separated when [Davis] was one year old, and that [Davis] never had the benefit of a father in the home when he was growing up. She stated that [Davis] went to Detroit to live with his father when he was 15 years of age, but *564 that his father died shortly thereafter and that his death was devastating to [Davis]. She further testified that she began to have trouble with [Davis] when he was about 9 years old; that he would misbehave at school and at home; that he dropped out of school when he was 16; that he would not work, would stay out at night, and was frequently in trouble; that after he turned 17, she could not handle him; and that he left home when he was 19. She asked the jury to spare her son’s life. Sigler also testified about [Davis’s] background and home life. He stated that [Davis] missed not having a father in the home; that because of his circumstances he ‘missed a lot’ when he was growing up; that when he was growing up he had no one to rely on, to talk to, or to help him; that when his father died he was noticeably affected and his appearance and attitude changed; and that he had not had the advantages that Sigler had had. Sigler also asked the jury to recommend a sentence of life imprisonment without parole. Storey, a counselor employed by the Calhoun-Cleburne Mental Health Center and the Oxford city school system, testified that she administered intelligence and diagnostic educational tests to [Davis] before his trial; that he had a full-scale IQ of 77, which placed him at the 6th percentile, i.e., 94% of the people in his age group scored higher; that an IQ of 77 is considered within the borderline range of intelligence; that he is functioning ‘between where we would consider an individual who is mentally retarded and one who is low average’; and that he functions at the 5th grade level academically. [Davis] called only one witness at the second sentencing hearing before the trial court, his mother, who testified again about her son’s general background and family life, and asked the court for mercy.”
Davis v. State, 718 So.2d at 1156.
Giddens testified at the Rule 32 hearing that Davis did not tell him that he had been abused as a child. Cocounsel Adams did not testify concerning his dealings with Davis or the extent of his investigation into Davis’s upbringing. We have reviewed the record of Davis’s trial and find that Adams’s involvement in the case was not minor. Adams conducted opening and closing statements and cross-examined the majority of the state witnesses. Also, Adams spoke with two of Davis’s siblings — though we do not know the identity of those siblings. We are troubled that Adams was not called to testify at the Rule 32 hearing when it is clear that he had a significant role in preparing for Davis’s trial.[3] However, Giddens testified at the Rule 32 hearing as follows:
“There was a lot of preparation. Mr. Adams and I — I had asked Judge Street if he would appoint me cocounsel since it was a capital murder case and that involved a lot of work. And I asked him to appoint a cocounsel. And he appointed Mr. Adams at my request. And Mr. Adams and I did a lot of preparation.
“We came into Anniston, interviewed a lot of witnesses, did a lot of research.” *565 (R. 36-37.) In preparing mitigation evidence, Giddens stated:
“[Giddens]: As I said, at the same time as you begin to assess the evidence. You begin to think about in the event that he’s convicted or she’s convicted of capital murder, what are you going to do in the sentence hearing. You have to be prepared for all of its.
“Q [Rule 32 counsel]: So when you started to prepare the guilt/innocence part of Mr. Davis’s case in November of 1993, that’s about the same time you began to prepare the mitigation case? “[Giddens]: Well, I mean, we had spoken with his mother sometime during that time and knew that she was going to be a witness in that event. And also got an order signed for a mental evaluation to use as mitigation if, you know, it if came out favorable or something you would want to offer mitigation for the defendant. I mean, during the time frame of preparing for the case, you have to prepare for the sentence hearing as well because it will be immediately after the trial.”
(R. 72-73.) Giddens said that Davis provided him with little information except that he was with Heard at the time of the robbery/murder.
“Counsel have a duty to investigate but this duty is confined to reasonable investigation. See Strickland, 466 U.S. at 691, 104 S.Ct. at 2066. In Funchess v. Wainwright, 772 F.2d 683, 689 (11th Cir.1985), this Court found counsel reasonably investigated despite the fact that he had not investigated his client’s psychological problems because the client never told him of any problems and the competency evaluation did not suggest any problems existed. The client also acted competently while assisting counsel in preparing his case. See id. Thus the court held that counsel was not put on notice of any problems and could not be faulted for not pursuing the matter. See id.; cf. Collins v. Francis, 728 F.2d 1322, 1349 (11th Cir.1984) (determining that counsel who failed to investigate witnesses that the defendant did not tell him about was not ineffective).
“Reliance upon some family members statements that other mitigation witnesses did not exist was considered permissible in Singleton v. Thigpen, 847 F.2d 668, 670 (11th Cir.1988). Rejecting a per se rule of ineffective assistance where counsel does not consult family members, we held in Williams v. Head, 185 F.3d 1223, 1237 (11th Cir.1999), that counsel’s investigation was reasonable when he did not interview the defendant’s sister or father, the latter because the defendant had not lived with him for very long. ‘[Strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make a reasonable investigation or to make a reasonable decision that makes particular investigations unnecessary.’ Strickland [v. Washington,] 466 U.S. [668] at 690-91, 104 S.Ct. [2052] at 2066 [(1984)].
“The conduct of the counsel here did not fall below the professionally competent standard. While the Warrens did not discover the records from Holladay’s stay at Central State Hospital in Mil-ledgeville, Georgia or records from other psychiatrists who treated Holladay, there is no evidence in the record, nor does Holladay allege, that he told them of his prior treatment. As in Funchess, the report of the lunacy commission that Holladay was sane and competent combined with counsel’s impression of Holla- *566 day as cooperative, articulate, and affable did not put Mrs. Warren on notice that there were or might be psychiatric records that she needed to find.”
Holladay v. Haley, 209 F.3d 1243, 1251-52 (11th Cir.2000). Based on the unusual circumstances presented in this case and the fact that we not know the extent of cocoun-sel’s investigation because Adams was not called to testify, we cannot say that counsel was ineffective for failing to discredit the statements of Davis, his mother, and two of his siblings, and to conduct yet more investigations. Thus, we conclude that the circuit court did not abuse its discretion in finding that the investigation conducted by Davis’s attorneys was reasonable. “Clearly this is not a case where counsel failed to investigate, a case where counsel was ignorant of what evidence could be presented in mitigation, or a case where counsel presented no mitigation evidence.” Waldrop v. State, 987 So.2d 1186, 1202 (Ala.Crim.App.2007).
Moreover,
“ ‘[a] defense attorney is not required to investigate all leads, however, and “there is no per se rule that evidence of a criminal defendant’s troubled childhood must always be presented as mitigating evidence in the penalty phase of a capital case.” ’ Bolender [v. Single-tary], 16 F.3d [1547,] at 1557 [(11th Cir.1994) ] (footnote, omitted) (quoting Devier v. Zant, 3 F.3d 1445, 1453 (11th Cir.1993), cert. denied, [513] U.S. [1161], 115 S.Ct. 1125, 130 L.Ed.2d 1087 (1995)). ‘Indeed, “[c]ounsel has no absolute duty to present mitigating character evidence at all, and trial counsel’s failure to present mitigating evidence is not per se ineffective assistance of counsel.” ’ Bolender, 16 F.3d at 1557 (citations omitted).”
Marek v. Singletary, 62 F.3d 1295, 1300 (11th Cir.1995). Evidence of childhood abuse has been described as a double-edged sword. See Johnson v. Cockrell, 306 F.3d 249, 253 (5th Cir.2002) (evidence of brain injury, abusive childhood, and drug and alcohol abuse was “double edged” because it would support a finding of future dangerousness). See also Miniel v. Cockrell, 339 F.3d 331 (5th Cir.2003); Harris v. Cockrell, 313 F.3d 238 (5th Cir.2002). The circuit court did not abuse its discretion in denying relief on this claim.
B.
Second, Davis argues that counsel was ineffective for failing to hire an expert—a social worker—to conduct an extensive background investigation on him.
The circuit court found that at the time of Davis’s trial in 1993, social workers were not routinely retained to assist in capital cases; thus, counsel was not ineffective for failing to request the assistance of a social worker.
“Although [counsel] did not hire an independent investigator, this fact alone is not indicative of ineffective assistance in a capital case. The decision to hire an investigator is reviewed for reasonableness. See Strickland, 466 U.S. at 691, 104 S.Ct. 2052.” Bower v. Quarterman, 497 F.3d 459, 470 (5th Cir.2007). Based on the information that counsel had obtained from Davis’s family members, counsel had no reason to conduct a more extensive investigation into Davis’s background. Thus, the circuit court did not abuse its discretion in denying relief on this claim.
C.
Third, Davis argues that counsel was ineffective for failing to present evidence that he suffered from damage to the frontal lobe of his brain. At the Rule 32 hearing, Giddens testified that he moved that Davis be mentally evaluated to determine his IQ and his academic performance. *567 He said that he and Adams planned to use this information in mitigation if Davis was convicted. Giddens further testified that Davis gave him no reason to believe that he was mentally impaired or that he could not assist in his defense.
Dr. Kimberly Ackerson, a clinical psychologist, testified at the Rule 32 hearing that after examining Davis she would have referred him to a neuropsychologist for further evaluation. Dr. Charles Golden, a professor of psychology at Nova Southeastern University and Director of the Neuropsychological Assessment Center, testified that based on Davis’s IQ scores it was his opinion that Davis had frontal-lobe damage.
The State countered Davis’s experts by calling Dr. Glenn King, a clinical psychologist. Dr. King testified that he had examined Davis and that it was his opinion that Davis “merely had borderline intellectual functioning” and that he would not refer Davis for further testing by a neuropsy-chologist.
Whether Davis suffered from brain damage was disputed by the medical experts. “[The defendant’s] presentation of conflicting expert opinion would have further undermined the defense’s credibility. Trial counsel ‘cannot be deemed ineffective’ for not presenting ... conflicting opinions.” Philmore v. State, 937 So.2d 578, 587 (Fla.2006). Therefore, counsel was not ineffective for failing to discover and present this disputed evidence.
D.
Fourth, Davis argues that counsel was ineffective for failing to investigate and to present evidence concerning the facts of Davis’s prior conviction for robbery. He asserts that the facts surrounding that offense were relevant to alleviate the impact of the aggravating circumstance that Davis had previously been convicted of a crime of violence. He cites Rompilla v. Beard, 545 U.S. 374, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005), for the proposition that he is entitled to a new sentencing hearing on that basis.
In Rompilla v. Beard, the United States Supreme Court held that counsel’s performance at the penalty phase of a capital-murder trial was ineffective because counsel failed to examine the court file of a prior conviction that the Commonwealth of Pennsylvania intended to use at sentencing. The Supreme Court noted that its holding was due, in part, to the fact that counsel was aware that the Commonwealth intended to seek the death penalty by relying solely on the aggravating circumstance that the defendant had a significant history of felony convictions involving the use of violence, that the Commonwealth intended to rely on a prior conviction for rape and assault, and that the Commonwealth intended to introduce the transcript of the victim’s testimony to show the defendant’s violent nature. The United States Supreme Court stated:
“Without making reasonable efforts to review the file, defense counsel could have no hope of knowing whether the prosecution was quoting selectively from the transcript, or whether there were circumstances extenuating the behavior described by the victim. The obligation to get the file was particularly pressing here owning to the similarity of the violent prior offense to the crime charged and Rompilla’s sentencing strategy stressing residual doubt. Without making efforts to learn the details and rebut the relevance of the earlier exime, a convincing ax'gument for residual doubt was certainly beyond any hope.
[[Image here]]
“If the defense lawyers had looked in the file on Rompilla’s prior conviction, it is uncontested they would have found a *568 range of mitigation leads that no other source had opened up. In the same file with the transcript of the prior trial were the records of Rompilla’s imprisonment on the earlier conviction, ..., which defense counsel testified she had never seen, id., at 508. The prison files pictured Rompilla’s childhood and mental health very differently from anything defense counsel had seen or heard. An evaluation by a corrections counselor states that Rompilla was ‘reared in the slum environment of Allentown, Pa, vicinity. He early came to the attention of juvenile authorities, quit school at 16, [and] started a series of incarcerations in and out Penna. often of assaultive nature and commonly related to overindulgence in alcoholic beverages.’ Lodging [to App. 111-120] 40. The same file discloses test results that the defense’s mental health experts would have viewed as pointing to schizophrenia and other disorders, and test scores showing a third grade level of cognition after nine years of schooling.
“The accumulated entries would have destroyed the benign conception of Rompilla’s upbringing and mental capacity defense counsel had formed from talking with Rompilla himself and some of his family members, and from the reports of the mental health experts.”
545 U.S. at 386-91, 125 S.Ct. 2456. In responding to a dissent to its opinion, the United States Supreme Court in Rompilla stressed that it was not creating a per se rule that counsel was automatically ineffective for failing to conduct a “complete review of the file on any prior conviction.” 545 U.S. at 388,125 S.Ct. 2456.
In this case there is no allegation that the file of Davis’s prior conviction contained a plethora of mitigating evidence. In fact, the record shows that Davis pleaded guilty to robbery in the third degree and that he was sentenced to one year and one day. At the sentencing phase of Davis’s trial counsel argued that he had been convicted and sentenced for the lowest degree of robbery recognized in Alabama. At the Rule 32 hearing Giddens testified as follows:
“[Rule 32 counsel]: Did you make an attempt to talk to any other person within the criminal justice system that had had any dealings with Jimmy? “[Giddens]: Criminal justice systems being I believe he had a robbery conviction that was offered against him. And I was aware of that. I mean, I had gotten those records so I was aware of that through the criminal justice system. “[Rule 32 counsel]: Did you speak to anyone involved in that case?
“[Giddens]: No. I reviewed the record on that and saw what he was convicted of it. And I think he actually served time on it.
[[Image here]]
“[Rule 32 counsel]: And you didn’t do any investigation to find out what the circumstances of that robbery was; did you?
“[Giddens]: Well, the only thing that is admissible is the conviction itself, not the facts of it.
“[Rule 32 counsel]: Even at a sentence hearing in mitigation?
“[Giddens]: The state offered simply a certified copy of the conviction. Which we don’t object to, because you didn’t want them to have to put on a witness to bring out the facts.”
(R. 100-01.)
Davis presented testimony at the Rule 32 hearing that his prior robbery in the third degree conviction was the result of Davis and several other individuals robbing a pizza delivery person of six pizzas. *569 Davis was caught by police running away with a pizza.
This case is distinguishable from Rom-pilla,. In Rompilla the sole aggravating circumstance that the Commonwealth was relying on to seek the death penalty was related to Rompilla’s prior conviction for violence. In this case, the State relied on two aggravating circumstances: that the murder was committed during a robbery and that Davis previously had been committed of a “felony involving the use or threat of violence.” Also, in Rompilla the attorney testified that she had not looked at the file of Rompilla’s prior rape conviction. Here, Giddens testified that he did examine the file on Davis’s prior conviction but had not spoken to anyone about the prior case. More importantly, the jury in this ease was aware that Davis had previously been convicted of the lowest degree of robbery. Counsel tried to minimize the prior conviction. Thus, we do not believe that Rompilla mandates that we reverse Davis’s sentence on this issue. As the Florida Supreme Court stated in Davis v. State, 928 So.2d 1089 (Fla.2005):
“The facts of the instant matter are entirely distinguishable from those present in Rompilla. As noted above, defense counsel in the present case reviewed all of the materials that were in his possession in preparation for Davis’s penalty phase trial. Moreover, unlike Rompilla, there is no indication that there was material here that trial counsel was aware the State was going to use in aggravation that was not obtained and reviewed by trial counsel prior to the penalty phase trial. Moreover, unlike defense counsel in Rompilla, Davis’s trial counsel reviewed records in the public defender’s file transmitted to him regarding Davis’s medical history, educational background, and other general background information surrounding his life. A thorough reading of the United States Supreme Court’s decision in Rompilla reveals that it is inapplicable to the facts of the instant matter. Unlike defense counsel’s deficient performance in Rompilla, trial counsel’s investigation in the instant matter was within the level of reasonable performance that is required by Strickland [v. Washington, 466 U.S. 668 (1984) ] and Wiggins [v. Smith, 539 U.S. 510 (2003)]. See Rompilla, 125 S.Ct. at 2463 (‘[T]he duty to investigate does not force defense lawyers to scour the globe on the off-chance something will turn up; reasonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste.’) (citing Wiggins, 539 U.S. at 525, 123 S.Ct. 2527; Strickland, 466 U.S. at 699, 104 S.Ct. 2052).”
928 So.2d at 1108. See also Miller v. State, 926 So.2d 1243, 1252-53 (Fla.2006). Thus, we cannot say that counsel was ineffective for failing to conduct a more detailed investigation into Davis’s prior conviction for robbery in the third degree.
E.
Fifth, Davis argues that Giddens and Adams were ineffective for failing to begin their trial preparation until two weeks before the trial was scheduled to begin. “However, mere shortness of time for preparation of counsel is insufficient to show ineffectiveness.” Randall v. State, 207 Ga.App. 637, 640, 428 S.E.2d 616, 620 (1993).
Although Giddens testified that the bulk of the work for Davis’s trial was conducted several weeks before trial, he also testified that he and Adams conducted an extensive investigation starting from the time they were appointed to represent Davis.
F.
Last, even if we were to find that counsel’s performance was deficient in the pen *570 alty phase of Davis’s trial, we would find no prejudice. As the United States Supreme Court stated in Wiggins v. Smith, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003):
“In Strickland [v. Washington, 466 U.S. 668 (1984) ], we made clear that, to establish prejudice, a ‘defendant must show that there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.’ Id., at 694, 104 S.Ct. 2052. In assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence.”
539 U.S. at 534,123 S.Ct. 2527.
The circuit court noted in its order denying relief that the evidence of Davis’s childhood abuse was not of “any great mitigation significance as his violent criminal behavior does not begin until years later after he is away from his mother and her influence.” The circuit court found in mitigation that Davis was only 23 years old at the time of the robbery/murder and the court also “considered all testimony and evidence presented to the jury and to the Court in regard to the defendant’s background, character, [and] education achievement level.” The court found that the failure to present evidence of Davis’s childhood abuse would not have prejudiced him.
We have reweighed the alleged omitted mitigation evidence against the aggravating circumstances that existed in this case. We agree with the circuit court that death was the appropriate sentence in this case and that the fact that certain potential mitigation evidence was not presented would have had no affect on the outcome.
For these reasons, we affirm the circuit court’s denial of Davis’s claims of ineffective assistance of trial counsel.
AFFIRMED.
McMILLAN and SHAW, JJ., concur.
BASCHAB, P.J., concurs specially, with opinion.
WISE, J., concurs in the result.

. In exchange for their testimony at Davis’s trial, Alphonso and Terrance Phillips pleaded guilty to conspiracy to commit robbery. Alphonso was sentenced to 20 years’ imprisonment, and Terrance was sentenced to 10 years’ imprisonment.

. Apparently, counsel did secure a ruling striking those references to gang activity from the letter. The Alabama Supreme Court in its opinion on direct appeal stated that there were no references to gang activity made at Davis's trial. Ex parte Davis, 718 So.2d 1166, 1175-76 (Ala.1998).